ROBERT LEE BOUDREAUX
and SHIRLEY A. BOUDREAUX

Plaintiffs,

v.  2014- 2032 "H"

AXIALL CORPORATION,
GEORGIA GULF CORPORATION,
GEORGIA GULF LAKE CHARLES, LLC,
and SUN, L.L.C.

Defendants.

Filed:  MAY 2 1 2014

14TH JUDICIAL DISTRICT COURT

STATE OF LOUISIANA

PARISH OF CALCASIEU

CASE NO. _____

Shelailyne Hardy
Deputy Clerk
2c/c 1 cont.
PL/CL

## PETITION FOR DAMAGES

The petition of ROBERT LEE BOUDREAUX and SHIRLEY A. BOUDREAUX (collectively, the "plaintiffs"), who are citizens of Louisiana and fully competent to bring this lawsuit, represents as follows:

1.

The defendants named herein are:

a.  AXIALL CORPORATION ("Axiall"), a Delaware corporation, which may be duly cited and served through its registered agent, Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129;

b.  GEORGIA GULF CORPORATION ("Georgia Gulf"), a Delaware corporation, which may be duly cited and served through its registered agent, Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129;

c.  GEORGIA GULF LAKE CHARLES, LLC ("Georgia Gulf"), a Delaware limited liability company, which may be duly cited and served through its registered agent, Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129; and

d.  SUN, L.L.C. ("Sun"), a Louisiana limited liability company with its principal place of business in Westlake, Louisiana, which may be duly cited and served through its registered agent, Damon Hardesty, 1608 North Hilma Street, Westlake, Louisiana 70669.

2.

The plaintiffs are the owners of approximately 44 acres of land situated in Calcasieu Parish.  This land is more particularly described as follows:  the North Half of the Northwest Quarter of the Southeast Quarter (N/2 of NW/4 of SE/4), consisting of approximately 20 acres,

Date 5-21-14
Check # 11157
From Veron, Bice
Amt $ 525.00
Recd by  Ct

Filing Date: 05/21/2014 1200 AM
Case Number: 2014-002032
Document Name: PETITION

Page Count 10

EXHIBIT
1

PROCESSED
Date: MAY 2 9 2014



and approximately 24 acres located in the South Half of the Northeast Quarter (S/2 of NE/4), all located in Section 28 of Township 9 South, Range 10 West, Calcasieu Parish.

3.

An aerial photograph depicting the approximate boundaries of the plaintiffs' land is attached as **Exhibit A**. The approximate boundaries are outlined in black.

4.

The plaintiffs' land, including the subsurface, is contaminated and damaged as a result of the wrongful acts and/or omissions attributable to the defendants. As described in more detail below, these wrongful acts and/or omissions occurred during the various work activities on or near the land that were incidental to and part of the operations associated with two brine pipelines that run through the plaintiffs' land.

5.

More specifically, Axiall owns and operates one 16-inch pipeline and one 10-inch pipeline that traverse the plaintiffs' land (collectively, the "pipelines"). The approximate location of these pipelines is shown in red on **Exhibit A**.

6.

Both of these pipelines generally run in a west to east direction from the Sulphur salt mines to the Axiall plant in Westlake, Louisiana.

7.

These pipelines transport brine—an aqueous solution of highly concentrated salt—which is used by Axiall at its Westlake plant to produce chlorine. Axiall, in turn, uses the chlorine to manufacture vinyl chloride monomer and other chlorinated ethylene products, or sells the chlorine to third parties for a profit.

8.

According to the former owner and operator of the pipelines, PPG Industries, Inc. ("PPG"), approximately *5.2 tons of brine per minute* flow through these pipelines from the Sulphur salt mines to the Westlake plant now owned by Axiall.

9.

Although PPG is the former owner and operator of the pipelines, PPG spun off its former commodity chemical business (which included, *inter alia*, the pipelines and the Westlake plant).

The company then merged with Georgia Gulf—Axiall's predecessor company.  This separation and merger transaction was completed in January of 2013.

10.

According to PPG's 2013 annual report, under the terms of the merger agreement, "PPG transferred environmental remediation liabilities . . . related to [its former] commodity chemical business to Axiall."

11.

Thus, as a result of the merger, Axiall assumed all responsibility for the environmental damage and contamination at issue in this lawsuit.

12.

Upon information and belief, Sun performs and/or has performed all or part of the maintenance and inspection of the pipelines.

13.

The pipelines have leaked brine (and potentially other hazardous or toxic substances) onto and under the plaintiffs' land.  The release of these toxic substances was caused by the fault and/or negligence of the defendants, including, but not limited to, the negligent operation, maintenance, and monitoring of the pipelines, valves, and other equipment used in connection with the pipelines.

14.

Upon information and belief, the released brine has seeped and leached into the subsurface soils and groundwater beneath the plaintiffs' land.  This migration is ongoing and continues to cause further damage to the plaintiffs' land.

15.

The brine that was released onto or under the plaintiffs' land from the pipelines is highly toxic in nature.

16.

The preliminary environmental investigation conducted on behalf of the plaintiffs shows that the soils in the vicinity of the pipelines have electrical conductivity readings as high as 90 mmhos/cm.  In simple terms, electrical conductivity provides an indication of the amount of salt in the soil.

17.

The independent laboratory results obtained during the preliminary investigation show that the electrical conductivity of the soils in the vicinity of the pipelines is *almost 100 times higher* than the electrical conductivity of the soils on the plaintiffs' land that are in their natural, or background, conditions.

18.

Although the plaintiffs only recently became aware of the damage to their land caused by the leaking pipeline, these leaks were apparently not an isolated incident.

19.

According to records obtained from the Louisiana Department of Environmental Quality ("DEQ"), Axiall and its predecessor reported that the two brine pipelines leaked *at least 14 times* during 2012 and 2013 alone.

20.

In fact, unbeknownst to the plaintiffs until recent months, these leaks became such a frequent occurrence that DEQ had an in-person meeting with various representatives of Axiall in April of 2013. The sole purpose of this meeting was to "discuss [the] on-going issues (leaks, repairs, etc.)" with the two brine pipelines.

21.

Axiall and its predecessor represented to DEQ each time they reported a leak from the pipelines that they had remediated all of the soils that had been contaminated as a result of the brine release. However, based on the preliminary environmental investigation conducted on behalf of the plaintiffs, those representations were false.

22.

The meeting with DEQ in April of 2013 obviously did nothing to change Axiall's practices and procedures concerning the pipelines.

23.

Indeed, on or around April 22, 2014, one of the pipelines ruptured yet again, which caused brine to escape onto and under the plaintiffs' land and neighboring lands.

- 4 -

24.

Upon information and belief, Axiall failed to remove all of the soil that was contaminated as a result of this latest brine leak in April of 2014 and, as before, Axiall did nothing to determine whether the subsurface soils and groundwater had been impacted by this latest release.

25.

The defendants are legally responsible for any and all compensatory damages associated with the damage to and contamination of the plaintiffs' land.  More specifically, the damage to the property is actionable as a tort, a breach of contract, a failure to operate prudently, a failure to maintain *garde* or control of the harmful byproducts of operations, a failure to observe the obligations of neighborhood or other personal or predial servitudes, and a failure to obey any laws under which the plaintiffs are a third-party beneficiary to contracts between the defendants and others.  The plaintiffs expressly reserve and do not waive any cause of action to which they may be entitled and seek to assert any and all causes of action permitted under the facts alleged.

26.

The damage to the plaintiffs' land includes, but is not necessarily limited to, deposits of brine and chlorides.

27.

At all pertinent times, the defendants knew or should have known that these materials were hazardous and toxic and had to be controlled and managed with all deliberate care in order to avoid unnecessary risk and danger to the public health, safety, and welfare.  Thus, in addition to compensatory damages, the plaintiffs are entitled to exemplary damages under Louisiana Civil Code article 2315.3 for the defendants' disregard of public safety in the handling, storage, and transportation of hazardous and toxic materials at any time between 1984 and 1996.

28.

It has been well-known for many decades that brine is highly corrosive, and that brine rapidly corrodes any metals or alloys.  For this reason, special precautions must be taken any time brine is transported through pipelines, including, but not limited to, extensive preventative maintenance and monitoring operations.

29.

The defendants ignored the decades of industry literature warning about the corrosive effects of brine and failed to undertake the necessary preventative maintenance and monitoring operations to ensure that the brine pipelines maintained their structural integrity.

30.

The damage described above was caused by multiple failures on the part of the defendants, including, but not limited to, the following: (i) the defendants' failure to obey the applicable terms of contracts and agreement governing their operations on the plaintiffs' land; (ii) the defendants' failure to exercise adequate care in conducting their operations and in controlling the brine running through the pipelines; (iii) the defendants' failure to heed industry warnings about the corrosive effects of brine; (iv) the defendants' failure to utilize standard operating practices and procedures that would have eliminated or avoided the damage to the plaintiffs' land; (v) the defendants' failure to inform the plaintiffs or their predecessors that damage was occurring and had occurred to the property, so that they could take steps to address the damage and prevent it from becoming worse; (vi) the defendants' failure to conduct proper maintenance on, and monitoring of, the pipelines; (vii) the defendants' failure to promptly remediate and remove any contamination caused by the pipelines; and (viii) the defendants' failure to promptly replace all or portions of the pipelines after experiencing numerous brine leaks in 2012 and 2013.

31.

The defendants not only failed to inform the plaintiffs about the damage to their land, but, in fact, may have acted in ways to conceal it from the plaintiffs.

32.

As lay individuals, the plaintiffs are not sophisticated about pipeline operations and environmental matters and could not be expected to discover or have any understanding of the defendants' failures, or how those failures might have caused or contributed to the damage to the plaintiffs' land. Moreover, the plaintiffs are not required to assume from the mere fact that there were pipeline operations on their land that there has been actionable contamination or damage.

33.

For these reasons, the plaintiffs did not know, and could not reasonably be expected to know, that they had a legal claim against the defendants until less than a year before the filing of this lawsuit. In fact, the plaintiffs learned for the first time that their land had been contaminated by one or both of the brine pipelines when they received the results of the preliminary environmental investigation in May of 2014.

34.

The deposit of contamination and foreign materials on and under the plaintiffs' land, and the defendants' failure to remove those materials, constitutes a continuing trespass.

35.

The defendants' actions have created an ongoing and damaging nuisance to the plaintiffs and their land, which continues to this date.

36.

In addition, the defendants' failure to restore the plaintiffs' land constitutes a continuing breach of duties imposed by tort law and contract law.

37.

The measure of compensatory damages is the amount necessary to put the plaintiffs in the position they would have been in had the defendants not breached the legal duties they owed to the plaintiffs.

38.

As a matter of law, these damages include, but are not limited to, any and all costs involved in restoring the plaintiffs' land to the condition it was in before the defendants damaged it, any and all damages associated with the loss of use of the land as a result of the contamination, attorneys' fees, and any other damages permitted by law.

39.

The defendants are solidarily liable with their predecessors and successors in title for all express and implied obligations related to the restoration of the plaintiffs' land.

40.

The measure of exemplary damages under Louisiana Civil Code article 2315.3 is the amount necessary to make an example of the defendants' bad conduct, and thus deter the

defendants and others who are similarly situated from engaging in conduct like this in similar instances in the future. The determination of that amount necessarily involves an examination of the defendants' financial condition.

41.

The defendants' conduct also violates the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), particularly that part enrolled at La. R.S. 51:1401, *et seq.*

42.

The defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious. These offensive acts and omissions include, but are not limited to, the defendants' failure to inform the plaintiffs of the damage they were causing to their land, their willful ignorance of the decades of industry literature warning about the corrosive effects of brine, their failure to promptly remediate and remove any contamination caused by the pipelines, and their failure to promptly replace all or portions of the pipelines after experiencing numerous brine leaks in 2012 and 2013.

43.

Under the provisions of LUTPA, the plaintiffs are entitled to recover their attorneys' fees and costs in bringing this lawsuit.

44.

On information and belief, none of the obligations that the plaintiffs seek to enforce has been discharged by bankruptcy or other debtor relief proceedings.

ACCORDINGLY, the plaintiffs herein, ROBERT LEE BOUDREAUX and SHIRLEY A. BOUDREAUX, respectfully pray that:

I.     The defendants named herein be duly cited and served with a certified copy of this petition and be made to respond in the manner and form required by law;

II.     After due proceedings, there be judgment herein in favor of the plaintiffs and against all defendants, *in solido,* for any and all compensatory and exemplary damages allowed by law; and

III.     They be granted such additional relief as the law, evidence, and equity warrant and this Court is competent to grant, including all costs of these proceedings.

Respectfully submitted, this 21st day of May, 2014.


J. Michael Veron (#7570)
Jere Jay Bice (#18793)
J. Rock Palermo III (#21793)
Alonzo P. Wilson (#13547)
Jamie B. Bice (#22412)
Turner D. Brumby (#33519)
VERON, BICE, PALERMO & WILSON, L.L.C.
721 Kirby Street, 70601
P.O. Box 2125
Lake Charles, LA 70602-2125
(337) 310-1600
Fax:  (337) 310-1601

Eulis Simien, Jr. (#12077)
Jimmy Simien (#1598)
SIMIEN & SIMIEN, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, LA 70809
(225) 925-1411
Fax:  (225) 932-9286

**Counsel for Plaintiffs**


**SERVICE INSTRUCTIONS:**

Please see paragraph 1, above,
for the named defendants and
service instructions.


Please serve the defendants with a
copy of the Petition for Damages and
Plaintiffs' First Set of Interrogatories and
Requests for Production of Documents.

2014-2032

# VERON
# BICE
# PALERMO &
# WILSON, LLC

ATTORNEYS AT LAW

J. MICHAEL VERON
JERE JAY BICE*
J. ROCK PALERMO III*
ALONZO P. WILSON
JAMIE B. BICE
MICHAEL G. HODGKINS
TURNER D. BRUMBY†

OF COUNSEL
ASHLEY E. PHILEN

*CERTIFIED MEDIATORS
†ALSO LICENSED IN GEORGIA

721 KIRBY STREET (70601)
POST OFFICE BOX 2125
LAKE CHARLES, LA 70602.2125

TELEPHONE (337) 310-1600
FACSIMILE (337) 310-1601
TOLL FREE (877) 300-8680

WEBSITE:
www.veronbice.com

EMAIL:
info@veronbice.com

May 21, 2014

Honorable H. Lynn Jones
Clerk of Court
Calcasieu Parish
Lake Charles, LA 70601

Re: Robert Lee Boudreaux and Shirley A. Boudreaux
Vs. Axiall Corporation, Georgia Gulf Corporation,
Georgia Gulf Lake Charles, LLC, and Sun, L.L.C.

Dear Mr. Jones:

Enclosed please find the original Petition for Damages, as well as
Plaintiffs' First Set of Interrogatories and Requests for Production of
Documents to Defendants to be filed on behalf of petitioners, Robert
Lee Boudreaux and Shirley A. Boudreaux. Also enclosed are
additional copies for service on the defendants as well as copies to
conform and return to me.

Further enclosed are two (2) additional copies of the Petition for
Damages, which we ask that you certify and return to me in order to
provide the required written notice to the Louisiana Department of
Environmental Quality.

Our firm check in the amount of $525.00 representing the advance
court cost deposit is enclosed.

Sincerely,

Turner Brumby

TURNER D. BRUMBY

TDB:mmc
Enclosures

ROBERT LEE BOUDREAUX
and SHIRLEY A. BOUDREAUX

         Plaintiffs,

v.

AXIALL CORPORATION,
GEORGIA GULF CORPORATION,
GEORGIA GULF LAKE CHARLES, LLC,
SUN, L.L.C., THE LEVINGSTON GROUP,
LLC, TURNER INDUSTRIES GROUP,
L.L.C., and VECTOR ELECTRIC AND
CONTROLS, INC.

         Defendants.

Filed: _____ **JUN 30 2014**

14TH JUDICIAL DISTRICT COURT

STATE OF LOUISIANA

PARISH OF CALCASIEU

CASE NO. 2014-2032 "H"

_Byron Wilkinson_
Deputy Clerk

## FIRST AMENDED AND RESTATED PETITION FOR DAMAGES

The petition of ROBERT LEE BOUDREAUX and SHIRLEY A. BOUDREAUX (collectively, the "plaintiffs"), who are citizens of Louisiana and fully competent to bring this lawsuit, represents as follows:

1.

The defendants named herein are:

a. AXIALL CORPORATION ("Axiall"), a Delaware corporation, which may be duly cited and served through its registered agent, Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129;

b. GEORGIA GULF CORPORATION ("Georgia Gulf"), a Delaware corporation, which may be duly cited and served through its registered agent, Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129;

c. GEORGIA GULF LAKE CHARLES, LLC ("Georgia Gulf"), a Delaware limited liability company, which may be duly cited and served through its registered agent, Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129;

d. SUN, L.L.C. ("Sun"), a Louisiana limited liability company with its principal place of business in Westlake, Louisiana, which may be duly cited and served through its registered agent, Damon Hardesty, 1608 North Hilma Street, Westlake, Louisiana 70669;

e. THE LEVINGSTON GROUP, LLC ("Levingston"), a Louisiana limited liability company with its principal place of business in Sulphur, Louisiana, which may be duly cited and served through its registered agent, Mark Gregory Nixon, 3222 Highway 108 South, Sulphur, Louisiana 70665;

f. TURNER INDUSTRIES GROUP, L.L.C. ("Turner"), a Louisiana limited liability company with its principal place of business in Baton Rouge, Louisiana,

which may be duly cited and served through its registered agent, John H. Fenner, III, 8687 United Plaza Boulevard, Baton Rouge, Louisiana 70809; and

g.  VECTOR ELECTRIC AND CONTROLS, INC. ("Vector"), a Louisiana corporation with its principal place of business in Gonzales, Louisiana, which may be duly cited and served through its registered agent, David Bateman, 6010 Perkins Road, Suite A, Baton Rouge, Louisiana, 70808.

2.

The plaintiffs are the owners of approximately 44 acres of land situated in Calcasieu Parish.  This land is more particularly described as follows:  the North Half of the Northwest Quarter of the Southeast Quarter (N/2 of NW/4 of SE/4), consisting of approximately 20 acres, and approximately 24 acres located in the South Half of the Northeast Quarter (S/2 of NE/4), all located in Section 28 of Township 9 South, Range 10 West, Calcasieu Parish.

3.

An aerial photograph depicting the approximate boundaries of the plaintiffs' land is attached as **Exhibit A**.  The approximate boundaries are outlined in black.

4.

The plaintiffs' land, including the subsurface, is contaminated and damaged as a result of the wrongful acts and/or omissions attributable to the defendants.  As described in more detail below, these wrongful acts and/or omissions occurred during the various work activities on or near the land that were incidental to and part of the operations associated with two brine pipelines that run through the plaintiffs' land.

5.

More specifically, Axiall owns and operates one 16-inch pipeline and one 10-inch pipeline that traverse the plaintiffs' land (collectively, the "pipelines").  The approximate location of these pipelines is shown in red on **Exhibit A**.

6.

Both of these pipelines generally run in a west to east direction from the Sulphur salt mines to the Axiall plant in Westlake, Louisiana.

7.

These pipelines transport brine—an aqueous solution of highly concentrated salt—which is used by Axiall at its Westlake plant to produce chlorine.  Axiall, in turn, uses the chlorine to

manufacture vinyl chloride monomer and other chlorinated ethylene products, or sells the chlorine to third parties for a profit.

8.

According to the former owner and operator of the pipelines, PPG Industries, Inc. ("PPG"), approximately *5.2 tons of brine per minute* flow through these pipelines from the Sulphur salt mines to the Westlake plant now owned by Axiall.

9.

Although PPG is the former owner and operator of the pipelines, PPG spun off its former commodity chemical business (which included, *inter alia*, the pipelines and the Westlake plant). The company then merged with Georgia Gulf—Axiall's predecessor company.  This separation and merger transaction was completed in January of 2013.

10.

According to PPG's 2013 annual report, under the terms of the merger agreement, "PPG transferred environmental remediation liabilities . . . related to [its former] commodity chemical business to Axiall."

11.

Thus, as a result of the merger, Axiall assumed all responsibility for the environmental damage and contamination at issue in this lawsuit.

12.

Upon information and belief, Sun performs and/or has performed all or part of the maintenance and inspection of the pipelines.

13.

The pipelines have leaked brine (and potentially other hazardous or toxic substances) onto and under the plaintiffs' land.  The release of these toxic substances was caused by the fault and/or negligence of the defendants, including, but not limited to, the negligent operation, maintenance, and monitoring of the pipelines, valves, and other equipment used in connection with the pipelines.

14.

Upon information and belief, the released brine has seeped and leached into the subsurface soils and groundwater beneath the plaintiffs' land.  This migration is ongoing and continues to cause further damage to the plaintiffs' land.

15.

The brine that was released onto and under the plaintiffs' land from the pipelines is highly toxic in nature.

16.

The preliminary environmental investigation conducted on behalf of the plaintiffs shows that the soils in the vicinity of the pipelines have electrical conductivity readings as high as 90 mmhos/cm.  In simple terms, electrical conductivity provides an indication of the amount of salt in the soil.

17.

The independent laboratory results obtained during the preliminary investigation show that the electrical conductivity of the soils in the vicinity of the pipelines is *almost 100 times higher* than the electrical conductivity of the soils on the plaintiffs' land that are in their natural, or background, conditions.

18.

Although the plaintiffs only recently became aware of the damage to their land caused by the leaking pipeline, these leaks were apparently not an isolated incident.

19.

According to records obtained from the Louisiana Department of Environmental Quality ("DEQ"), Axiall and its predecessor reported that the two brine pipelines leaked *at least 14 times* during 2012 and 2013 alone.

20.

In fact, unbeknownst to the plaintiffs until recent months, these leaks became such a frequent occurrence that DEQ had an in-person meeting with various representatives of Axiall in April of 2013.  The sole purpose of this meeting was to "discuss [the] on-going issues (leaks, repairs, etc.)" with the two brine pipelines.

21.

Axiall and its predecessor represented to DEQ each time they reported a leak from the pipelines that they had remediated all of the soils that had been contaminated as a result of the brine release.  However, based on the preliminary environmental investigation conducted on behalf of the plaintiffs, those representations were false.

22.

The meeting with DEQ in April of 2013 obviously did nothing to change Axiall's practices and procedures concerning the pipelines.

23.

On or around April 22, 2014—roughly a year *after* the meeting with DEQ—one of the pipelines ruptured yet again, which caused brine to escape onto and under the plaintiffs' land and neighboring lands.

24.

Upon information and belief, Axiall failed to remove all of the soil that was contaminated as a result of this brine leak in April of 2014 and, as before, Axiall did nothing to determine whether the subsurface soils and groundwater had been impacted by this release.

25.

Indeed, even the filing of this lawsuit has done nothing to change Axiall's practices and procedures concerning the pipelines.

26.

More specifically, Axiall and/or its subcontractors discovered yet another leak from one or both of the pipelines on or about June 12, 2014—roughly three weeks *after* the filing of this lawsuit.  This leak once again caused brine to escape onto and under the plaintiffs' land.

27.

Axiall thereafter hired Levingston, Turner, and Vector to repair the leaking pipeline(s) and, presumably, to remedy any damage caused as a result of this most recent brine release.

28.

Upon information and belief, Axiall, Levingston, Turner, and Vector knew that the plaintiffs' land, including the surface and subsurface soils and possibly the groundwater, had been damaged and contaminated by this latest release.

29.

Despite this, Axiall, Levingston, Turner, and Vector failed to remove any of the soil on the plaintiffs' land that was contaminated as a result of this release in June of 2014 and, as before, Axiall, Levingston, Turner, and Vector did nothing to determine whether the subsurface soils and groundwater had been impacted by this release.

30.

Instead, Axiall, Levingston, Turner, and Vector simply excavated around the location of the pipeline(s) leak, welded a "patch" on the pipeline(s), and then placed the same contaminated soil back in the excavated area.

31.

The defendants are legally responsible for any and all compensatory damages associated with the damage to and contamination of the plaintiffs' land.  More specifically, the damage to the property is actionable as a tort, a breach of contract, a failure to operate prudently, a failure to maintain *garde* or control of the harmful byproducts of operations, a failure to observe the obligations of neighborhood or other personal or predial servitudes, and a failure to obey any laws under which the plaintiffs are a third-party beneficiary to contracts between the defendants and others.  The plaintiffs expressly reserve and do not waive any cause of action to which they may be entitled and seek to assert any and all causes of action permitted under the facts alleged.

32.

The damage to the plaintiffs' land includes, but is not necessarily limited to, deposits of brine, chlorides, and other hazardous and toxic substances found in the brine transported through the pipelines.

33.

At all pertinent times, the defendants knew or should have known that these materials were hazardous and toxic and had to be controlled and managed with all deliberate care in order to avoid unnecessary risk and danger to the public health, safety, and welfare.  Thus, in addition to compensatory damages, the plaintiffs are entitled to exemplary damages under Louisiana Civil Code article 2315.3 for the defendants' disregard of public safety in the handling, storage, and transportation of hazardous and toxic materials at any time between 1984 and 1996.

34.

It has been well-known for many decades that brine is highly corrosive, and that brine rapidly corrodes any metals or alloys.  For this reason, special precautions must be taken any time brine is transported through pipelines, including, but not limited to, extensive preventative maintenance and monitoring operations.

35.

The defendants ignored the decades of industry literature warning about the corrosive effects of brine and failed to undertake the necessary preventative maintenance and monitoring operations to ensure that the brine pipelines maintained their structural integrity.

36.

The damage described above was caused by multiple failures on the part of the defendants, including, but not limited to, the following:  (i) the defendants' failure to obey the applicable terms of contracts and agreement governing their operations on the plaintiffs' land; (ii) the defendants' failure to exercise adequate care in conducting their operations and in controlling the brine running through the pipelines; (iii) the defendants' failure to heed industry warnings about the corrosive effects of brine; (iv) the defendants' failure to utilize standard operating practices and procedures that would have eliminated or avoided the damage to the plaintiffs' land; (v) the defendants' failure to inform the plaintiffs or their predecessors that damage was occurring and had occurred to the land, so that they could take steps to address the damage and prevent it from becoming worse; (vi) the defendants' failure to conduct proper maintenance on, and monitoring of, the pipelines; (vii) the defendants' failure to promptly remediate and remove any contamination caused by the pipelines; and (viii) the defendants' failure to promptly replace all or portions of the pipelines after experiencing numerous brine leaks in 2012 and 2013.

37.

The defendants not only failed to inform the plaintiffs about the damage to their land, but, in fact, may have acted in ways to conceal it from the plaintiffs.

38.

As lay individuals, the plaintiffs are not sophisticated about pipeline operations and environmental matters and could not be expected to discover or have any understanding of the

- 7 -

defendants' failures, or how those failures might have caused or contributed to the damage to the plaintiffs' land. Moreover, the plaintiffs are not required to assume from the mere fact that there were pipeline operations on their land that there has been actionable contamination or damage.

39.

For these reasons, the plaintiffs did not know, and could not reasonably be expected to know, that they had a legal claim against the defendants until less than a year before the filing of this lawsuit. In fact, the plaintiffs learned for the first time that their land had been contaminated by one or both of the brine pipelines when they received the results of the preliminary environmental investigation in May of 2014.

40.

The deposit of contamination and foreign materials on and under the plaintiffs' land, and the defendants' failure to remove those materials, constitutes a continuing trespass.

41.

The defendants' actions have created an ongoing and damaging nuisance to the plaintiffs and their land, which continues to this date.

42.

In addition, the defendants' failure to restore the plaintiffs' land constitutes a continuing breach of duties imposed by tort law and contract law.

43.

The measure of compensatory damages is the amount necessary to put the plaintiffs in the position they would have been in had the defendants not breached the legal duties they owed to the plaintiffs.

44.

As a matter of law, these damages include, but are not limited to, any and all costs involved in restoring the plaintiffs' land to the condition it was in before the defendants damaged it, any and all damages associated with the loss of use of the land as a result of the contamination, attorneys' fees, and any other damages permitted by law.

45.

The defendants are solidarily liable with their predecessors and successors in title for all express and implied obligations related to the restoration of the plaintiffs' land.

46.

The measure of exemplary damages under Louisiana Civil Code article 2315.3 is the amount necessary to make an example of the defendants' bad conduct, and thus deter the defendants and others who are similarly situated from engaging in conduct like this in similar instances in the future. The determination of that amount necessarily involves an examination of the defendants' financial condition.

47.

The defendants' conduct also violates the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), particularly that part enrolled at La. R.S. 51:1401, *et seq.*

48.

The defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious. These offensive acts and omissions include, but are not limited to, the defendants' failure to inform the plaintiffs of the damage they were causing to their land, their willful ignorance of the decades of industry literature warning about the corrosive effects of brine, their failure to promptly remediate and remove any contamination caused by the pipelines, and their failure to promptly replace all or portions of the pipelines after experiencing numerous brine leaks in 2012 and 2013.

49.

Under the provisions of LUTPA, the plaintiffs are entitled to recover their attorneys' fees and costs in bringing this lawsuit.

50.

On information and belief, none of the obligations that the plaintiffs seek to enforce has been discharged by bankruptcy or other debtor relief proceedings.


ACCORDINGLY, the plaintiffs herein, ROBERT LEE BOUDREAUX and SHIRLEY A. BOUDREAUX, respectfully pray that:

I.    The defendants named herein be duly cited and served with a certified copy of this petition and be made to respond in the manner and form required by law;

-9-

II.     After due proceedings, there be judgment herein in favor of the plaintiffs and against all defendants, *in solido,* for any and all compensatory and exemplary damages allowed by law; and

III.    They be granted such additional relief as the law, evidence, and equity warrant and this Court is competent to grant, including all costs of these proceedings.

Respectfully submitted, this 30th day of June, 2014.

J. Michael Veron (#7570)
Jere Jay Bice (#18793)
J. Rock Palermo III (#21793)
Alonzo P. Wilson (#13547)
Jamie B. Bice (#22412)
Turner D. Brumby (#33519)
VERON, BICE, PALERMO & WILSON, L.L.C.
721 Kirby Street, 70601
P.O. Box 2125
Lake Charles, LA 70602-2125
(337) 310-1600
Fax:  (337) 310-1601

Eulis Simien, Jr. (#12077)
Jimmy Simien (#1598)
SIMIEN & SIMIEN, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, LA 70809
(225) 925-1411
Fax:  (225) 932-9286

***Counsel for Plaintiffs***

**SERVICE INSTRUCTIONS:**

Please see paragraph 1, above,
for the named defendants and
service instructions.

Please serve **only the following defendant**
with a copy of the First Amended and Restated
Petition for Damages:  Sun, L.L.C.

- 10 -

Please serve **only the following defendants** with a
copy of the original Petition for Damages, the
First Amended and Restated Petition for Damages,
and Plaintiffs' First Set of Interrogatories and
Requests for Production of Documents:  (1) The Levingston
Group, LLC, (2) Turner Industries Group, L.L.C.,
and (3) Vector Electric and Controls, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, pursuant to article 1313 of the Louisiana Code of Civil

Procedure, I have served a true and correct copy of the foregoing pleading on all known counsel

of record on this 30th day of June, 2014, as follows:

_____     By facsimile transmission

_____     By deposit in the United States Mail

____x____     By e-mail transmittal


_____
TURNER D. BRUMBY

- 11 -



SONRIS Interactive Map
Disclaimer: This data is not to be used for legal purposes.

Absolute Scale: 1:5,144
Relative Scale: 1 inch = 429 feet



Filing Date: 06/30/2014 12:00 AM          Page Count: 1
Case Number: 2014-002032
Document Name: FILE EXHIBITS



JUN 30 2014

Calcasieu Parish, Louisiana



EXHIBIT

A

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **ROBERT LEE BOUDREAUX and SHIRLEY A. BOUDREAUX** | * | **CIVIL ACTION NO.:   2:14-cv-02283** |
| | * | |
| **VERSUS** | * | **JUDGE PATRICIA MINALDI** |
| | * | |
| **AXIALL CORPORATION, GEORGIA GULF CORPORATION, GEORGIA GULF LAKE CHARLES, LLC, SUN, L.L.C., THE LEVINGSTON GROUP, LLC, TURNER INDUSTRIES GROUP, L.L.C. AND VECTOR ELECTRIC AND CONTROLS, INC.** | * | **MAGISTRATE KATHLEEN KAY** |

******************

### PLAINTIFFS' SECOND AMENDING AND SUPPLEMENTAL PETITION

NOW INTO COURT, through undersigned counsel, come Robert Lee Boudreaux and Shirley A. Boudreaux, who amend and supplement their petition in the following manner:

I.

By naming Eagle US 2, LLC, a foreign limited liability company, as a defendant, which may be served through its agent for service of process, C T Corporation System, 5615 Corporate Boulevard, Suite 400B Baton Rouge, Louisiana 70808.

1

II.

By adding the following paragraphs:

51.

On March 26, 2014, Robert Lee Boudreaux and Shirley A. Boudreaux were and now are in possession of the following described immovable property located in Calcasieu Parish, Louisiana and described as follows:

> The North Half of the Northwest Quarter of the Southeast Quarter (N ½ of NW ¼ of SE ¼) of Section Twenty-Eight (28), Township Nine (9) South, Range Ten (10) West, less and except part sold to Roy I. Barnes as per Deed dated March 24, 1955, Calcasieu Parish, Louisiana, hereinafter referred to as the "Property."

52.

Beginning on September 13, 2007, Robert Lee Boudreaux acquired the Property from James Ray Richard and Juanita Marie Hollier Richard in a Cash Sale of that date, this deed being filed on September 14, 2007, under File Number 2831996, and recorded in Conveyance Book 3386 at Page 190, records of Calcasieu Parish, Louisiana.   Since that date through the present, Robert Lee Boudreaux has had the possession of the property as owner.

53.

On March 24, 2014, defendant Axiall Corporation disturbed Robert Lee Boudreaux's possession of the Property by causing a document purporting to evidence the ownership of Axiall Corporation and/or Eagle US 2, LLC, to a portion of the property, more specifically the property described in the deed as follows:

2

"A strip of land in the Northwest Quarter of the Southeast Quarter of Section 28, Township 9 South, Range 10 West, being 100 feet in width, more or less, and running East and West from East line to West line of said Northwest Quarter of Southeast Quarter of Section 28, Township 9 South, Range 10 West and bounded North by North line of Northeast Quarter of Southeast Quarter of Section 29, Township 9 South, Range 10 West and South by a line 50 feet South of center of Railroad as now located and East and West by East and West lines of said quarter section."

This deed was by and between Burlington Resources Oil & Gas Company, Vendor, and

Axiall Corporation and/or Eagle US 2, LLC, Vendee, and was filed on March 26, 2014, under

File Number 3132805, and recorded in Conveyance Book 3940 at Page 213, records of

Calcasieu Parish, Louisiana.

54.

During the period of one year immediately prior to the disturbance by Axiall

Corporation, Robert Lee Boudreaux and Shirley A. Boudreaux were in possession of the

Property quietly and without interruption.

55.

Further the March 24, 2014 filing of documents by defendant purporting to transfer

ownership was plaintiffs' first notice, actual or otherwise, that defendants were seeking to

adversely possess the land or possess the same as anything other than as "precarious possessors".

In addition, plaintiff have only recently been informed that the pipeline servitudes exercised by

Axiall Corporation and its predecessors and now its purported successor, Eagle US 2, LLC, are

being exercised without the lawful ownership of these servitudes and as such constitute a

continuing trespass upon the plaintiffs' property.  It is specifically alleged by plaintiffs that the

defendants entries upon their land were gained through a continuing fraud or artifices in which

the defendants and their employees and contractors had a duty to speak and advise the plaintiffs

3

of the defendants' lack of title and ownership or right to enter upon same. Instead, said defendants and individuals acting for defendants made affirmative misrepresentations of such rights.

56.

At the time Axiall Corporation's predecessors to the purported pipeline servitudes began operating each of the same, the purported granter of the servitudes did not have title to the property over which the servitudes were granted.  As such, neither Axiall Corporation, its predecessors nor its successor, Eagle US 2, LLC, obtained proper grants of the pipeline servitudes.

57.

Nor has Axiall Corporation, its predecessor, or its successor to the purported pipeline servitudes acquired ownership of the servitudes by acquisitive prescription of either ten (10) or thirty (30) years as they have not met the requirements of law and for the reasons more fully set herein including but not limited to their "precarious possession" and failure to give the notice of adverse possession to the plaintiffs until on or after March 24, 2014, etc.

58.

At the time of the purported transfer/grant of the servitudes to Axiall Corporation and/or its predecessor, all sophisticated commercial purchaser(s) who routinely and customarily researched and relied upon the public records, under Louisiana law and jurisprudence these purchasers/grantees would not be considered as having acquired nor possessed the servitude in good faith since the public records clearly set forth that the purported sellers/grantors of the servitudes did not own the property over which the servitude was being granted.

4

59.

Nor could any possession by Axiall Corporation, its predecessors or successor be considered the type of possession that would give rise to acquisitive prescription since their possession of the servitudes began as a purported precarious possessor, which were possessing under a purported grant of the servitudes from the purported owner of the subservient estate, and therefore they never formed the requisite intent to acquire the servitudes by acquisitive prescription nor gave the requisite notice sufficient to terminate the possession as a precarious possession and begin possession which would act as possession sufficient to establish acquisitive prescription of the servitudes.

60.

Prior to August, 1977, possession of a servitude such as a pipeline servitude was not the type of possession which would have given rise to a claim of acquisitive prescription because the passage through the subservient estate required the act of man and was therefore not considered as continuous, which was a requirement of acquisitive prescription under Louisiana law prior to August, 1977.

61.

Even after August, 1977, though the requirement of continuous possession was eliminated, acquisitive prescription still required possession different than that exercised by a precarious possessor, as was Axiall Corporation and its predecessors and its successor, and also required that the possession be open and obvious.  Upon information and belief, plaintiff allege that the purported visible markings including but not limited to signage and other alleged acts of possession of the pipeline servitudes by Axiall Corporation and its predecessors was not open

5

and obvious for the requisite period of time to constitute acquisitive prescription even if they had otherwise had the requisite possession to acquisitively acquire the servitudes.

62.

In the alternative, if it is determined by the trier of fact that Axiall Corporation, its predecessors and/or successor had acquired the pipeline servitudes on the property of the plaintiffs, by acquisitive prescription of either ten (10) or thirty (30) years, the servitude would be limited to extent of the actual path and scope of the servitudes as previously possessed including but not limited to the depth and location and other particulars of the same, etc.

63.

As such, the defendants would have no right to move or replace the pipelines that were acquired, if they were, by acquisitive prescription, as to do so would go beyond the scope of the acquired servitudes.

64.

Upon information and belief, plaintiffs allege that recently Axiall Corporation or its predecessor has moved at least one of the pipelines to another location which was not included within the purported possession by Axiall Corporation and its predecessors.  As such, even assuming, the acquisitive prescription of the pipeline servitudes as originally purportedly possessed by Axiall Corporation and its predecessors, the movement of the pipeline to a different location is a violation of the plaintiffs' property rights that would not be subject to the pipeline servitudes purportedly acquired by acquisitive prescription.

6

65.

Further, under Louisiana law and jurisprudence the holder of a servitude cannot damage the subservient estate and has a continuing duty to repair any damages to same, which under the facts of this case would include the full and complete costs of all damages associated with the cleanup and remediation of any contamination or pollution to the land or water.

66.

The defendants and their predecessors and successors as the dominant estate of a servitude also would only have acquired such rights, by acquisitive prescription of either ten (10) or thirty (30) years, as are necessary for the use of a servitude and would have been required to exercised the same in a way least inconvenient for the servient estate causing the least possible damage.

67.

Due to the continuous unlawful acts and trespass by Axiall Corporation, its predecessors and its successor, Eagle US 2, LLC, which have continued to illegally obtain profits from the use of plaintiffs' property, the plaintiffs are entitled to punitive, compensatory, injunctive and equitable reliefs and monetary damages including but not limited to disgorgement of all of the profits so obtained from the transportation of goods and services across plaintiffs' land.

WHEREFORE, Robert Lee Boudreaux and Shirley A. Boudreaux, reiterating all the prayers and allegations of their prior pleading also pray:

I.      That judgment be rendered in their favor and against Axiall Corporation and Eagle US 2, LLC recognizing Robert Lee Boudreaux's right to the possession of the Property and further maintaining Robert Lee Boudreaux's possession in the Property and that an Order issue to Axiall Corporation and any successors in title, including Eagle US 2, LLC, to assert its and/or their claim of ownership to the Property within 60 days or be precluded forever from asserting the claim thereafter, together with all damages incurred as a result of the disturbance of law arising out of the filing and recordation of the Cash Sale by and between Burlington Resources Oil & Gas Company, L.P. and Axiall Corporation and/or Eagle US 2, LLC as described above, together with all other just and equitable relief.

II.      That there be judgment recognizing that neither Axiall Corporation or its successor, Eagle US 2, LLC, have the right to continue to operate the pipeline servitudes currently being operated on plaintiff's property;

III.      That there be judgment in favor of plaintiffs requiring Axiall Corporation and its purported successor, Eagle US 2, LLC, to remove the pipelines from the plaintiffs' property and to pay to the plaintiffs all damages caused to his property and all profits made by these defendants and/or their predecessor whose liability they assumed in the unlawful operation of the pipeline servitudes;

IV.      Any and all other relief to which the plaintiffs are entitled, including remediation of the damages caused to their property by the operation of the purported pipeline servitudes; and

8

V.    Any and all other relief to which the plaintiffs are entitled, including punitive, compensatory, injunctive and equitable reliefs and monetary damages including but not limited to disgorgement of all of the profits so obtained from the transportation of goods and services across plaintiffs' land.

Respectfully submitted:

_/s/ J. Rock Palermo III_____
J. Michael Veron (# 7570)
Jere Jay Bice (# 18793)
J. Rock Palermo III (# 21703)
Alonzo Wilson (# 13547)
Jamie B. Bice (# 22412)
Turner D. Brumby (# 33519)
VERON, BICE, PALERMO & WILSON, L.L.C.
721 Kirby Street 70601
P.O. Box 2125
Lake Charles, LA 70602-2125
(337) 310-1600
Fax:   (337) 310-1601

Eulis Simien, Jr. (#12077)
Jimmy Simien (#1598)
SIMIEN & SIMIEN, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, LA 70809
(225) 925-1411
Fax:   (225) 932-9286

*Counsel for Plaintiffs*

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served a copy of the above and foregoing on all counsel of record by electronic filing and/or United States mail.

Lake Charles, Louisiana, this 9th day of September, 2014.


_____/s/_____ *J. Rock Palermo III* _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Louisiana

| | | |
|---|---|---|
| ROBERT LEE BOUDREAUX AND SHIRLEY A. BOUDREAUX | ) ) ) ) | |
| *Plaintiff(s)* | ) ) ) | Civil Action No.  2:14-cv-02283 |
| v. | ) ) | |
| AXIALL CORPORATION, GEORGIA GULF CORPORATION, GEORGIA GULF LAKE CHARLES, LLC, SUN, L.L.C., ET AL | ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Eagle US 2, LLC,
Through its agent for service of process
C T Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
J. ROCK PALERMO III
VERON, BICE, PALERMO & WILSON, L.L.C.
P.O. BOX 2125
LAKE CHARLES, LA 70602

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   2:14-cv-02283

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                        *Server's signature*

                                        _____
                                                        *Printed name and title*


                                        _____
                                                        *Server's address*


Additional information regarding attempted service, etc: