UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

---

| | |
|---|---|
| ROBERT LEE BOUDREAUX, ET AL. | CIVIL ACTION NO. 18-0956 |
| VERSUS | JUDGE DONALD E. WALTER |
| AXIALL CORPORATION, ET AL. | MAGISTRATE JUDGE KAY |

---

**MEMORANDUM RULING**

Before the Court is a Motion for Partial Summary Judgment Seeking Dismissal of Plaintiffs' Prescribed Tort Claims filed by the Defendants, Eagle US 2 LLC ("Eagle"), Axiall Corporation, and Axiall, LLC (collectively "Defendants"). See Record Document 61. Plaintiffs, Robert Lee Boudreaux and Shirley A. Boudreaux (collectively "Plaintiffs" or "the Boudreauxs") oppose the motion. See Record Document 119. For the reasons assigned herein, the Defendants' motion is **DENIED**.

**BACKGROUND INFORMATION**

The Boudreauxs allege that they have been damaged by brine leaking from two pipelines crossing their land.[1] See Record Document 1-15 at ¶ 5. The pipelines are currently owned by Eagle, a wholly owned subsidiary of Axiall Corporation, and are used to transport brine from the Sulphur salt dome mines to a chemical plant in Westlake, Louisiana. See id. at ¶¶ 6-7. The

---

[1] The Defendants' First Supplemental Answer contains a Reconventional Demand challenging the Plaintiffs' purported ownership of the strip of land where the pipelines are located. See Record Document 56-1 at 9-10. Defendants allege that Axiall is the owner of the 100-foot strip of land containing the pipelines, having acquired title from Brimstone Railroad and Canal Company, or alternatively, by acquisitive prescription through their possession greater than thirty years without interruption. See id. at 10. A determination of ownership is not required to consider the pending motion.

pipelines were previously owned by PPG Industries, Inc. ("PPG"), and were acquired by Defendants in January, 2013. See id. at ¶ 12.

On May 21, 2014, the Plaintiffs filed suit against the Defendants. See Record Document 1-1 at 1. The Boudreauxs allege that leaks from the two pipelines have severely contaminated their land, and that "the damage to their land is actionable as a tort, a breach of contract, a failure to operate prudently, a failure to maintain *garde* or control of the harmful byproducts of operations, a failure to observe the obligations of neighborhood and other personal or predial servitudes, and a failure to obey any laws under which the plaintiffs are a third-party beneficiary to contracts between the defendants and others." See Record Document 1-15 at ¶ 38. The Boudreauxs also allege that the contamination of their land, and Defendants' failure to remove the materials, constitutes a continuing trespass. See id. at ¶ 47. They further allege that Defendants' actions have created an ongoing and damaging nuisance, and that Defendants' failure to restore their land constitutes a continuing breach of duties imposed by tort law and contract law. See id. at ¶¶ 48-49.

Defendants filed a motion for partial summary judgment seeking to dismiss all tort claims arising from events occurring before May 21, 2013, which Defendants maintain are barred by prescription. See Record Document 61-1 at 6. Plaintiffs oppose the motion, arguing that Defendants are unable to demonstrate when they acquired actual or constructive knowledge of each leak, which is necessary to commence the running of prescription. See Record Document 119 at 8-9.

## LAW AND ANALYSIS

I. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. See Celotex, 477 U.S. at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion"). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor. See Little, 37 F.3d at 1075. A grant of summary judgment is warranted when the record as a whole "could not lead a rational finder of facts to find for the nonmoving party." Matsushita, 475 U.S. at 587.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

## II. Louisiana Law Regarding Prescription

In Louisiana, delictual claims are subject to a one-year prescriptive period. See La. Civ. Code art. 3492. In cases involving damage to immovable property, "the one year prescription commences to run from the day the owner of the immovable property acquired, or should have acquired, knowledge of the damage." La. Civ. Code art. 3493. Prescription runs against all persons unless an exception is established by legislation. See La. Civ. Code. art. 3467. Louisiana recognizes three exceptions to the running of prescription: suspension, interruption, and renunciation. See Taranto v. La. Citizens Property Ins. Co., 2010-0105 (La. 3/15/11), 62 So.3d 721, 726. "Jurisprudence provides that statutes involving prescription are strictly construed against prescription and in favor of the obligation sought to be extinguished." Id.

### A. Burden of Proof

The parties have presented the Court with conflicting caselaw as to which party bears the burden of proof regarding prescription in the context of a motion for summary judgment. Defendants contend that although the burden of proof ordinarily rests with the mover, if it is shown that a plaintiff's claim is barred on the face of the complaint the burden shifts to the plaintiff to prove that suspension, interruption, or an exception to prescription, such as the continuing tort doctrine or the doctrine of *contra non valentum*, is applicable. See Record

Document 61-1 at 12 (citing Daigle v. McCarthy, 444 F.Supp.2d 705, 710 (W.D. La. July 31, 2006)). The Court identified similar caselaw. See Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002); Poe v. Fuller, No. 17-0913, 2020 WL 6151563, at *2 (W.D. La. Oct. 20, 2020); Aertker v. Placid Holding Co., 874 F.Supp.2d 585, 592 (M.D. La. June 15, 2012) (citing Mallett v. McNeal, 2005-2289 (La. 10/17/06), 939 So.2d 1254, 1258); Harney v. Select Portfolio Servicing, Inc., No. 16-1998, 2018 WL 1182407, at *9 (E.D. La. March 7, 2018).

Conversely, Plaintiffs argue that the burden of proof always remains with a defendant when prescription is raised in a motion for summary judgment. See Record Document 119 at 11. In support, Plaintiffs cite to Hogg v. Chevron USA, Inc., 2009-2632 (La. 7/6/10), 45 So. 3d 991, 998, which states: "[the] traditional allocation of the burden of proof is altered somewhat when prescription is raised through a motion for summary judgment rather than through the peremptory exception. In such a case, the movant is required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which the plaintiffs acquired actual or constructive knowledge of the damage sufficient to commence the running of prescription." Id. at 998 (internal citations omitted). The Court has identified two federal cases following the burden of proof as suggested by Plaintiffs and set forth in Hogg. See Tex. Brine Co., LLC v. Dow Chem. Co., No. 15-1102, 2017 WL 3705811, at *4 (E.D. La. Aug. 28, 2017); LaShip, LLC v. Hayward Baker, Inc., No. 11-0546, 2013 WL 5739062, at *8 (E.D. La. Oct. 22, 2013).

The Fifth Circuit has not addressed the conflict between its 2002 decision in Terrebonne noted above and the 2010 Hogg decision by the Louisiana Supreme Court. The Erie doctrine provides that federal courts are to apply state substantive law and federal procedural law. See Cates v. Sears, Roebuck & Co., 928 F.2d 679, 687 (5th Cir. 1991) (discussing Erie R. Co. v.

5

Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938)). This sounds like a simple matter, but courts have discovered that the "[c]lassification of law as 'substantive' or 'procedural' for Erie purposes is sometimes a challenging endeavor." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427, 116 S.Ct. 2211, 2219 (1996). On this point the Fifth Circuit has determined that "[t]he question of who sustains the burden of proof is substantive and in diversity cases is therefore controlled by state law." See Chevron Oronite Co., LLC v. Jacobs Field Servs. N. Am., Inc., 951 F.3d 219, 232 (5th Cir. 2020) (quoting Benavides v. Mut. Life Ins. Co., 516 F.2d 393, 400 (5th Cir. 1975)).[2] Accordingly, this Court will proceed in applying the burden of proof as set forth by the Louisiana Supreme Court in Hogg.[3]

### B. The Plaintiffs' Complaint

Plaintiffs filed their original lawsuit on May 21, 2014, which would ordinarily preclude all tort claims for damages to immovable property arising on or before May 21, 2013, of which Plaintiffs were aware, unless prescription was interrupted or an exception applies. See Record Document 1-1 at 1; La. Civil Code arts. 3492, 3493. Defendants argue that Plaintiffs' complaint asserts facially prescribed claims. See Record Document 61-1 at 12. Specifically, Defendants contend that the Plaintiffs' complaint suggests that they seek to recover damages for leaks that

---

[2] Although this case was removed pursuant to the federal contractor statue, 28 U.S.C. § 1442(a)(1), the Court's role is similar to that of a federal court sitting in diversity. See Comardelle v. Penn. Gen. Ins. Co., No. 13-6555, 2014 WL 7139436, at *2 n. 23 (E.D. La. Dec. 15, 2014).

[3] This result is also in line with the Supreme Court's "outcome determination" test, which provides that a court should consider whether the result of the litigation would be significantly affected if a federal court disregards a law of a state that would be controlling if the cause of action by the same parties were in state court. See Guaranty Trust Co. v. New York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470 (1945). If the outcome would be affected, a court sitting in diversity must apply state law. See id. The intent of Erie is that the outcome of a case heard in federal court exercising diversity should be substantially the same as if it were tried in state court. See id.

occurred prior to January 2013, when Defendants' corporate predecessor, PPG, was the owner of the pipelines. See Record Document 146 at 2. Defendants cite to the following allegations in Plaintiffs' complaint:

> According to PPG's 2013 annual report, under the terms of the merger agreement, "PPG transferred environmental remediation liabilities …. related to [its former] commodity chemical business to Axiall." - ¶ 13.
>
> Thus, as a result of the separation and merger involving PPG, Axiall assumed liability for at least some of the environmental damage and contamination at issue in this lawsuit. - ¶ 14.
>
> …
>
> According to records obtained from the Louisiana Department of Environmental Quality ("DEQ"), Axiall, Eagle, and/or their predecessor reported that the two brine pipelines leaked at least 14 times during 2012 and 2013 alone. - ¶ 22.
>
> …
>
> The damage described above was caused by multiple failures on the part of the defendants, including, but not limited to the following: … (viii) the defendants' failure to promptly replace all or portions of the pipelines after they experienced numerous brine leaks in 2012 and 2013. - ¶ 43.

See id. (citing Record Document 119-2 at ¶¶ 13-14, 22, 43).

The Plaintiffs' complaint specifically alleges that leaks occurred on or about April 22, 2014, and June 12, 2014. See Record Document 1-15 at ¶¶ 27-28, 31. Plaintiffs also note that two additional leaks occurred on August 18, 2014, and October 16, 2014, although it is not alleged that either leak occurred on or near Plaintiffs' land. See id. at ¶ 36. These are the only leaks with specific dates noted in Plaintiffs' complaint, and all fall within the one-year prescriptive period for tort claims. Thus, Plaintiffs' tort claims based on the specific leaks mentioned in the complaint are timely. While Plaintiffs do allege that Axiall assumed liability from PPG for some of the environmental damage and contamination alleged in the lawsuit,

Plaintiffs' complaint does not specify which of their claims, whether in tort or contract, rely on actions taken by PPG or matters occurring prior to May 21, 2013.[4]

The Court's inquiry regarding prescription is complicated by the fact that Plaintiffs have stated numerous times in their briefs during the course of this litigation that the pipelines have experienced close to 600 leaks since the year 2000, and that 37 of the leaks allegedly occurred on or near Plaintiffs' land. See e.g. Record Document 118 at 2; Record Document 119 at 7; Record Document 120 at 5. This information is not included in the complaint, presumably because it only became known to the Plaintiffs during discovery. Plaintiffs have provided the Court with a detailed list of 596 leaks from the pipelines that were apparently tracked by PPG, including the date and location where each leak occurred. See Record Document 119-3. Thus, it appears that it is possible to isolate exactly when each of the 37 leaks occurred on or near Plaintiffs' land. Unfortunately, the Court has not identified such a list in the record.

Plaintiffs' opposition brief to the instant motion provides some clarity of their intentions. Therein, the Plaintiffs argue that each brine leak is a separate and distinct event for purposes of prescription.[5] See id. at 23. Based on this contention, Plaintiffs argue that Defendants have the burden of proving when they "knew or should have known, of the damage to their land caused by each and every leak from the brine pipelines." See id. at 24. Plaintiffs contend that Defendants have failed to provide evidence of when they became aware of more than thirty of

---

[4] The Court notes that Plaintiffs recently filed a Motion for Partial Summary Judgment requesting the Court to "enter an order declaring as a matter of law Eagle expressly assumed all liabilities and obligations arising out of PPG's pre-January 2013 brine pipeline operations, and that Eagle is responsible for any contamination and damage to the Plaintiffs' land caused by these operations." See Record Document 132 at 1.

[5] Plaintiffs indicate in their opposition brief that the continuing tort doctrine is inapplicable to this case. See Record Document 119 at 23, n. 28.

the documented leaks on or near their land. See id. at 25. Based on the briefing, it appears that Plaintiffs are indeed seeking damages in tort for each of the 37 leaks.

        **C.**        **Whether Some of Plaintiffs' Tort Claims are Prescribed**

For causes of action involving damage to immovable property, "the one year prescription commences to run from the day the owner of the immovable property acquired, or should have acquired, knowledge of the damage." La. Civ. Code art. 3493. The commencement of prescription is triggered by the "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." See Campo v. Correa, 2001-2707 (La. 6/21/02), 828 So.2d 502, 510. "A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same." Id. "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." Id. at 510-11. "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." Id. at 511. "Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start the running of prescription." Id. "In assessing whether an injured party possessed constructive knowledge to commence the running of prescription, this court's ultimate consideration is the reasonableness of the injured party's action or inaction in light of the surrounding circumstances." Hogg v. Chevron, 45 So.3d at 997-98. The surrounding circumstances include the plaintiff's "education, intelligence, and the nature of the defendant's conduct." Marin v. Exxon Mobil Corp., 2009-2368 (La. 10/19/10), 48 So.3d 234, 246.

The Louisiana doctrine of *contra non valentum* prevents the running of liberative prescription under certain circumstances. See Kling Realty Co., Inc. v. Chevron USA, Inc., 575 F.3d 510, 517 (5th Cir. 2009). Although the doctrine recognizes four categories of cases where prescription will be prevented from running, only the fourth category applies in this instance:

"where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." See id.[6] A plaintiff's ignorance cannot be attributed to his own neglect, and "a plaintiff will be deemed to know what he could by reasonable diligence have learned." Broussard v. Chevron, U.S.A., No. 11-1146, 2013 WL 5798942, at *3 (W.D. La. Oct. 25, 2013) (citing Marin, 48 So.3d at 246). In the context of a summary judgment motion, the burden rests with Defendants to demonstrate that there is no genuine material factual issue in dispute regarding when a plaintiff acquired actual or constructive knowledge of the damage. See Trahan v. BP America Prod. Co., 2016-267 (La. App. 3 Cir. 12/7/16), 209 So.3d 166, 172.

Defendants argue that Robert Boudreaux admitted in sworn deposition testimony that he possessed actual knowledge of leaks from the brine pipelines in 2007, within the first year after he purchased the property in question. See Record Document 61-1 at 9. In support, Defendants offer the following segments of Mr. Boudreaux's deposition:

> Q. And it was a couple of weeks after that you moved on that you first learned that there were leaks on the property, or was it a couple weeks after you signed –
>
> A. Yeah.
>
> Q. -- after you signed this Cash Sale?
>
> A. No. It was after I moved on it.
>
> Q. Okay. So between the time –
>
> A. It was in July. Sometime in July.

---

[6] *Contra non valentem* may also apply where the defendant has engaged in some act to effectively prevent a plaintiff from availing himself to his cause of action. See Marin, 48 So.3d at 245. Defendants argue that this option is unavailable because Mr. Boudreaux conceded in his deposition that Defendants never attempted to conceal or hide damage or information about leaks on his property. See Record Document 61-1 at 16.

> Q. All right. And that's – it was a couple of weeks after that that you first learned there were brine leaks on the strip?
>
> [opposing counsel objects to form]
>
> A. Right.
>
> \* \* \* \* \* \* \* \* \* \*
>
> Q. That's a good question. So tell me the first time you remembered seeing a leak out there.
>
> A. Oh, I don't remember. That's been –
>
> Q. Okay, I'll ask it this way. You said you figured out, though, within a couple of weeks of moving onto the property that there were leaks going on out there; right?
>
> A. Yeah.
>
> Q. And how'd you figure that out; what happened to help you figure it out?
>
> A. I don't follow the question. How did I figure out they had leaks?
>
> Q. Yeah.
>
> A. When I seen them travelling down the right-of way.[7]
>
> Q. So this was sometime in July of 2007?
>
> A. Yeah.

See Record Document 61-1 at 7; Record Document 61-2 (herein "Boudreaux Dep.") at 208, 210-211.

Defendants note that Mr. Boudreaux further testified that he met a brine field employee named Robert Domaingue ("Domaingue"), who introduced himself, provided a business card to Mr. Boudreaux, and advised Mr. Boudreaux to call him if he observed any leaks from the pipeline. See Record Document 61 at 7 (citing Boudreaux Dep. at 98-99). Mr. Boudreaux

---

[7] Mr. Boudreaux also testified that he knew that a leak had occurred when he saw vehicles traveling on the right-of way containing the pipelines, stating: "whenever trucks start passing by, the welding truck and the little backhoe they used, I know they got a leak. So I went down there to see." See Boudreaux Dep. at 104.

testified that he met Domaingue "probably the first year" after he bought the property. See Boudreaux Dep. at 96. However, he later testified that he was uncertain of when he met Domaingue, stating: "it could have been 2007, it could have been, 2008, I don't – you know." See id. at 98. In a follow up question Mr. Boudreaux was asked "So the problems with the leaks started pretty soon after you bought the property?" See id. Mr. Boudreaux responded: "Right." See id.

Defendants note that Mr. Boudreaux testified that on at least one occasion he personally discovered a leak and notified employees and/or contractors of the Defendants. See Record Document 61-1 at 8; Boudreaux Dep. at 88-92. Mr. Boudreaux described the leak he discovered as "seeping through the ground." See Boudreaux Dep. at 92. Regarding the timing of this discovery, the Court notes that Mr. Boudreaux testified that the leak "seeping through the ground" occurred "2 or 3 years ago, or maybe more" prior to his deposition in July 2018, which is insufficient to determine if this specific leak occurred prior to May 21, 2013. See id. at 91-92.

Plaintiffs counter by arguing that Defendants have mischaracterized Mr. Boudreaux's testimony by ignoring portions of his deposition wherein he indicated uncertainty about the timing of his knowledge of the leaks. See Record Document 119 at 19. Mr. Boudreaux also provided the following testimony regarding the timing of his knowledge: "How'd I find out? I don't recall. I don't remember when I found out. There's so many leaks happened on this pipeline – I don't – you're trying to get me confused. I don't know how many times it leaked, and I don't know how many times I seen it. You know? I don't recall when the first time or the last time. I don't remember." Boudreaux Dep. at 231.[8]

---

[8] Plaintiffs provided additional pages from Mr. Boudreaux's deposition. See Record Document 119-8 (pages 99-102, 231, 240-241, 293-294, 300-301, 314, 319, 321-322).

Defendants also note that Mr. Boudreaux testified that from the first leak he observed he was aware that brine could kill or discolor grass and vegetation. <u>See</u> Record Document 61-1 (citing Boudreaux Dep. at 240). Plaintiffs counter that regarding the bare spots of grass Mr. Boudreaux actually stated: "I guess it's from the brine. I didn't know what it was at the time." <u>See</u> Record Document 119 at 21; Boudreaux Dep. at 240-41. Defendants also state that Mr. Boudreaux suspected that a brine leak killed one of his oak trees. <u>See</u> Record Document 61-1 at 8 (citing Boudreaux Dep. at 315-16). It does appear that Mr. Boudreaux testified that brine killed one of his oak trees. <u>See</u> Boudreaux Dep. at 294. However, when asked if this occurred before he filed his lawsuit Mr. Boudreaux answered uncertainly: "might have been before." <u>See id.</u>

Defendants also argue that even before Mr. Boudreaux completed the purchase of the property, he was aware of erosion on his property caused by the brine leaks. <u>See</u> Record Document 61-1 at 3, n. 9 (citing Boudreaux Dep. at 315-317). Mr. Boudreaux answered affirmatively when he was asked if he had seen erosion next to the strip of land containing the pipelines by the time he signed the Cash Sale in 2007. <u>See</u> Boudreaux Dep. at 315. Plaintiffs counter that Mr. Boudreaux later clarified when he discovered erosion on his property, and denied knowing about it prior to his purchase of the property. <u>See</u> Record Document 119 at 20 (citing Boudreaux Dep. at 314). Mr. Boudreaux testified that he "thought you was talking about something else" when he indicated that he was aware of erosion prior to the purchase of his land. <u>See</u> Boudreaux Dep. at 319. When questioned again as to when he first saw erosion along the strip of land containing the pipelines Boudreaux answered: "I don't recall…I don't want to guess at it… probably in 2000—maybe '12, '13, or '14 or somewhere in that area I started seeing some erosion." <u>Id.</u> at 321.

Based on all of the above, Defendants argue that Mr. Boudreaux had actual knowledge of brine leaks on his property more than a year before his lawsuit was filed. See Record Document 61-1 at 10. As such, Defendants argue this direct and actual knowledge of leaks precludes the application of *contra non velentem*. See Record Document 61-1 at 14. Alternatively, Defendants contend that Mr. Boudreaux had constructive knowledge based on his possession of information sufficient to incite curiosity, attention, or place a reasonable person on guard to call for inquiry. See id. at 10. Therefore, Defendants contend that any claims arising before May 21, 2013, are prescribed and must be dismissed with prejudice. See id.

Plaintiffs argue that, at most, the Defendants have only established an approximate location and date for four of the leaks on Plaintiffs' property. See Record Document 119 at 19.[9] Plaintiffs note that Mr. Boudreaux testified: "They had so many leaks on this thing, I don't recall all of them that they had, and I never was there for a lot of them. You know? … So I don't recall specific which one and where, or what [.]." See Boudreaux Dep. at 102.

Based on the record and testimony provided, the Court finds that material facts remain as to when Mr. Boudreaux acquired actual or constructive knowledge of the leaks on his property. While it is clear to the Court that Mr. Boudreaux became aware of leaks at some point, it is unclear to the Court precisely when this occurred. The submitted portions of Mr. Boudreaux's deposition contain significant contradictory statements on the critical issue of the timing of his knowledge, whether actual or constructive. Accordingly, the Court finds that genuine issues of

---

[9] Plaintiffs also argue that Defendants failed to provide evidence of Mrs. Boudreaux's knowledge of the leaks. See Record Document 119 at 22. However, it appears that Mrs. Boudreaux's knowledge may be irrelevant. It is an undisputed fact that Mr. Boudreaux purchased the property in question. See Record Document 61-3 at ¶ 2. Mrs. Boudreaux was not listed on the cash sale deed, and no evidence has been introduced to suggest that she was added to the deed. See Record Document 61-2, Ex. 2. If Mr. Boudreaux purchased the property before he married Mrs. Boudreaux, as stated by Defendants, the property would not be considered community property unless Mr. Boudreaux has stipulated as much. See La. Civ. Code arts. 2341 and 2343.1.

14

material fact remain as to whether some of Plaintiffs' tort claims are prescribed. If, during the course of this litigation, more precise information regarding the timing of Mr. Boudreaux's knowledge becomes available, Defendants may certainly raise the issue again.

## CONCLUSION

Based on the foregoing, Defendants' Motion for Partial Summary Judgment Seeking Dismissal of Plaintiffs' Prescribed Tort Claims (Record Document 61) is **DENIED**. An order in accordance with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, this 23nd day of March, 2021.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE