# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| ROBERT LEE BOUDREAUX, ET AL. | CIVIL ACTION NO. 18-0956 |
| VERSUS | JUDGE DONALD E. WALTER |
| AXIALL CORP., ET AL. | MAGISTRATE JUDGE KAY |

## <u>MEMORANDUM RULING</u>

Before the Court is a Motion to Dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), or alternatively, a Rule 12(e) Motion for More Definite Statement, and Plea of Discussion filed by Third-Party Defendants Parsons Government Services, Inc., Gilbane Building Company, and Gilbane Inc. ("Parsons-Gilbane"). See Record Document 110.[1]  Third-Party Plaintiffs Eagle US 2 LLC ("Eagle"), Axiall Corporation and Axiall, LLC (collectively "Eagle/Axiall") oppose the motion. See Record Document 126. For the reasons assigned herein, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND INFORMATION

### I.     Procedural Background

On May 21, 2014, Plaintiffs, Robert Lee Boudreaux and Shirley A. Boudreaux ("the Boudreauxs" or "Plaintiffs") filed a petition in state court against Axiall Corporation, Georgia

---

[1] Parsons-Gilbane request that the Court apply Louisiana's Plea of Discussion to exhaust the assets of the Joint Venture created in connection with the Strategic Petroleum Reserve Program between Parsons Government Services, Inc. and Gilbane Building Company before turning to the secondary obligors to satisfy any potential adverse judgment. See Record Document 110-1 at 8-9. Eagle/Axiall object to the request. See Record Document 126 at 18-20. The Court will reserve examining this issue until such time as it becomes relevant.

Gulf Corporation, Georgia Gulf Lake Charles, LLC[2], and several other defendants unrelated to this motion, for damages allegedly caused by leaks from two pipelines traversing their immovable property near Sulphur, Louisiana.  See Record Document 1-1 at 1.  Axiall Corporation, Georgia Gulf Corporation, and Georgia Gulf Lake Charles, LLC removed the case alleging diversity jurisdiction pursuant to 28 U.S.C. § 1441(a).  See Civil Action No. 14-cv-2283, Record Document 1.  On February 5, 2015, Plaintiffs amended their petition to name Eagle as the owner and operator of the pipelines in question.  See Civil Action No. 14-cv-2283, Record Documents 16 and 38.  On September 16, 2016, this Court determined that diversity jurisdiction did not exist and the matter was remanded to state court.  See Civil Action No. 14-cv-2283, Record Documents 85 and 86.

While this matter was remanded to state court, Eagle filed a Supplemental Answer to the Plaintiffs' petition that asserted third-party claims against the Parsons-Gilbane companies as well as their alleged insurers, National Union Fire Insurance Company ("National Union"), Granite State Insurance Company, and Lexington Insurance Company (collectively "Third-Party Insurers").  See Record Document 1-2. On July 20, 2018, Parsons-Gilbane removed the case once again, alleging jurisdiction pursuant to 28 U.S.C. § 1442(a)(1) based on its purported status as a federal government contractor.  See Record Document 1.  Plaintiffs filed a motion to remand.  See Record Document 13. On August 1, 2019, this Court adopted the Report and Recommendation of the Magistrate Judge denying Plaintiffs' motion.  See Record Document 47.

On August 30, 2019, the Third-Party Defendants each filed a motion to dismiss Eagle/Axiall's claims.  See Record Documents 48 and 49.   In response, on September 20, 2019,

---

[2] On or about July 7, 2017, Georgia Gulf Lake Charles, LLC merged into Axiall, LLC, which is the surviving entity.  See Record Document 56-1 at ¶ 2.

Eagle/Axiall filed a "First Supplemental and Amended Third Party Complaint" against the Third-Party Defendants and Third-Party Insurers.  <u>See</u> Record Document 51.  Thereafter, the Third-Party Defendants and Third-Party Insurers each filed a second motion to dismiss.  <u>See</u> Record Documents 60 and 70.   On October 26, 2019, Eagle/Axiall requested leave of the Court to file a Second Supplemental and Amended Third-Party Complaint, which was opposed by the Third-Party Defendants and Third-Party Insurers.  <u>See</u> Record Documents 73, 83 and 84.   On March 20, 2020, the Magistrate Judge granted the request, and the Second Supplemental and Amended Third-Party Complaint was filed into the record.  <u>See</u> Record Documents 102 and 103.  Of note, the Second Supplemental and Amended Third-Party Complaint added another Third-Party Defendant to the litigation, Boeing Petroleum Services, Inc. ("BPS").  <u>See</u> Record Document 103.  In light of the revisions to the operative Third-Party complaint, this Court denied the previously filed motions to dismiss without prejudice and provided a deadline for resubmission.  <u>See</u> Record Document 108.  Thereafter, Parsons-Gilbane re-filed its motion to dismiss for failure to state a claim, or alternatively, motion for a more definite statement, which is the subject of this Memorandum Ruling.  <u>See</u> Record Document 110.

## II.    Factual Background

At its heart, the third-party litigation concerns whether the Third-Party Defendants may be held liable for damage allegedly caused by the pipeline leaks upon the Boudreauxs' land. Eagle/Axiall's Second Supplemental and Amended Third Party Complaint (henceforth "Complaint") sets forth theories of liability against the Parsons-Gilbane companies, their alleged insurers, and BPS that stem from the use of the salt dome mines in Sulphur, Louisiana by the federal government for oil storage in connection with the Strategic Petroleum Reserve ("SPR") program.  <u>See</u> Record Document 103.  During that time period the salt mines were owned by

Allied Chemical Corporation ("Allied"), who leased the exclusive right to drill, mine, and produce salt brine to PPG Industries, Inc. ("PPG").[3]  See Record Document 103-1 (Exhibit 1).

It is alleged that the United States Department of Energy selected Parsons-Gilbane to construct and operate underground oil storage reserve facilities in Louisiana and Texas, including the Sulphur Mines at issue in this case.  See Record Document 103 at ¶ 8.[4] Thereafter, it is alleged that Parsons-Gilbane, as the primary contractors of the project, were responsible for, among other things, selecting subcontractors, reviewing construction designs, construction schedule control, construction and material inspection, environmental monitoring, the review of designs and contracts, construction planning estimates, scheduling and cost control, labor relations, and safety programs.  See id. at ¶¶ 8-9.

In connection with the SPR project, it is alleged that the federal government executed an "Accommodation Agreement" dated February 2, 1979, with Allied and PPG setting forth the government's intention to acquire large portions of the mines through the use of eminent domain. See Record Document 103 at ¶ 10; Record Document 103-1 (Exhibit 1).  The Accommodation Agreement also allegedly contains a provision requiring PPG to be kept whole and insured for any property damage as a consequence of the SPR construction and operations at the Sulphur Mines.  See id.  Further, it is alleged that the Accommodation Agreement required assurance that Allied and PPG would be held harmless for any activities at a level beyond what the Department of Energy could legally grant.  See Record Document 103 at ¶ 11.  This was allegedly resolved

---

[3] On January 22, 2013, PPG sold the pipelines in question to Eagle, whom the Boudreauxs claim are liable as the alleged successor of PPG.  See Record Document 103 at ¶ 5; Record Document 103-3 (Exhibit 3).

[4] It is alleged that The Ralph M. Parsons Company, the predecessor in interest to Parsons Government Services, Inc., Gilbane Building Company and/or Gilbane, Inc., formed a joint venture and/or partnership for the purpose of the SPR project at the Sulphur Mines.  See Record Document 103 at ¶ 3.

by the Department of Energy requiring Parsons-Gilbane to increase insurance coverage from $7,000,000 to $10,000,000, and to add Allied and PPG as additional named insureds.  See id. This resolution is noted in a Department of Energy Stewardship Report dated January 25, 1979. See Record Document 103-2 (Exhibit 2) at 7.

The terms of the Accommodation Agreement allegedly provided for the careful coordination of all operations between the SPR, Allied, and PPG regarding the development of replacement salt brining caverns, which required sequential development of storage caverns in three phases and allowed the filling with oil of any cavern deemed necessary.  See Record Document 103 at ¶ 12.  Finally, it is further alleged that, pursuant to the Accommodation Agreement, it was required that Parsons-Gilbane install and connect piping and fittings in a workmanlike manner at no cost or liability to Allied or PPG so that PPG could resume brining operations.  See id.  On January 22, 2013, PPG assigned and conveyed all right, title, and interest in the Accommodation Agreement to Eagle and its related companies.  See id. at ¶ 13.

Parsons-Gilbane allegedly entered into at least two contracts with the Department of Energy during its time serving as construction manager that provided direct and indirect benefits to Eagle/Axiall (as successors in interest to PPG).  See Record Document 103 at ¶ 14; Record Document 1-4; Record Document 1-7.  It is alleged that a contract dated March 18, 1977, ("Contract 1") contains provisions requiring Parsons-Gilbane to "protect the Government's property and all adjacent property from injury arising out of the furnishing of general condition items."  Record Document 103 at ¶ 14; Record Document 1-4 at 35-36.  "General condition items" are defined as "items which … do not lend themselves readily to inclusion in one of the separate contracts…" and may include "…general maintenance; subsoil exploration; refuse disposal; …storage on-site or off-site of long lead procurement items; and miscellaneous minor

construction work when it is not feasible for the Government to secure competitive bids or proposals thereon." Record Document 103 at ¶¶ 14-15. Finally, it is alleged that Contract 1 contained by reference a standard Federal Energy Administration General Provision entitled "Insurance –liability to third persons." See id. at ¶ 16; Record Document 1-4 at 66.

By letter dated January 19, 1978, the federal government terminated Contract 1 and immediately awarded Parsons-Gilbane a second contract ("Contract 2") that provided for a continuation of the services detailed in Contract 1. See Record Document 103 at ¶ 17; Record Document 1-5. It is alleged that Contract 2 states that Parsons-Gilbane were retained to oversee the design, long-lead material purchasing and control, construction and operation effort, and to furnish the overall management and coordination of the construction of the SPR facilities, including the Sulphur Mines. See Record Document 103 at ¶¶ 19-20; Record Document 1-7 at 28-29. It is further alleged that Parsons-Gilbane were responsible for (1) furnishing all necessary personnel and equipment to the Sulphur Mines, (2) insuring that all aspects of the operation and maintenance of the Sulphur Mines were executed in an environmentally acceptable manner, abiding by all environmental protection requirements, (3) evaluating oil quality control procedures in effect in the oil acquisition, transportation, and storage system, and (4) staffing and running the SPR control center office in New Orleans. See Record Document 103 at ¶¶ 21-24; Record Document 1-7 at 42-44.

Eagle/Axiall contend that Contract 2 required Parsons-Gilbane to procure and maintain certain bonds and insurance. See Record Document 103 at ¶¶ 24-25; Record Document 1-6 at 72-73; Record Document 1-8 at 43. Parsons-Gilbane were allegedly required to maintain insurance to cover third-party property damage caused by their operations and activities at the Sulphur Mines. See Record Document 103 at ¶ 26. Eagle/Axiall state they "have been informed

and thus believe and assert that Parsons-Gilbane w[ere] required by the SPR Contracting Officer to secure and maintain insurance" that would have covered the property of PPG and Allied, including the pipelines at issue in this case.  Id. at ¶ 27.  It is also alleged that as a standard business practice Parsons-Gilbane would have required all subcontractors to provide appropriate insurance.  See id. at ¶ 28.  Eagle/Axiall assert that the Accommodation Agreement and Contracts 1 and 2 demonstrate an intention to extend insurance obligations in favor of PPG.  See id. at ¶¶ 28-29.  As noted above, PPG allegedly assigned its rights in the Sulphur Mines, including the pipelines in question, to Eagle in 2013.  Thus, Eagle/Axiall assert that Parsons-Gilbane and the Third-Party Insurers are liable to them under the terms of the Accommodation Agreement, Contracts 1 and 2, and the related insurance policies for the damage further described herein.  See id. at ¶ 31.

Eagle/Axiall assert that certain insurance policies were issued by National Union to cover the SPR operations of its insureds, Parsons-Gilbane, including numerous comprehensive liability policies.  See Record Document 103 at ¶¶ 32-33; Record Document 103-4 (Exhibit 4).  Each of the policies allegedly provide occurrence-based coverage and "defense obligations for third-party property damages 'including liability assumed under contract.'"  Record Document 103 at ¶ 34.  Eagle/Axiall note that each of the National Union policies includes a provision stating that "the unqualified word 'insured' includes the insured name and also includes … any person or organization to whom the named insured is obligated by a written contract… to provide insurance such as is afforded by this policy…."  Id. at ¶ 35.  Eagle/Axiall state that on information and belief, additional insurance policies exist that provide similar coverage for third-party damage.  See id. at ¶ 36.  Finally, Eagle/Axiall contend that Parsons-Gilbane were required,

by contract, to obtain and secure valid and collectible insurance covering the property of Allied and PPG at the Sulphur Mines, including the pipelines at issue in this case.  See id. at ¶ 37.

Eagle/Axiall allege that the pipelines in question were damaged when Parsons-Gilbane and/or their agents, employees, and subcontractors constructed and operated the Sulphur Mines negligently and in breach of contractual obligations owed to PPG to perform work in a workmanlike manner.  See id. at ¶ 38.  Specifically, it is alleged that damage was caused by the introduction into the brine caverns of untreated water from the Sabine River Diversion Canal that contained microbial agents (sulfate reducing bacteria) and other organic matter which resulted in microbiologically influenced corrosion in the pipelines at issue in this litigation, such that internal corrosion prematurely caused deterioration of the pipelines leading to the brine leaks cited by the Boudreauxs in their original cause of action.  See id.

Eagle/Axiall assert that their expert witness, Dr. Srdjan Nesic, has opined in reports and testimony that the pipelines suffered internal corrosion as a result of Parsons-Gilbane's injection of untreated water during the development and operation of the SPR, which contained large amounts of biodegradable food material that acted as a food source for the sulfate reducing bacteria. See id. at ¶ 39.  Eagle/Axiall claim that the environmental threat due to the introduction of untreated water and potential for bacterial contamination was known to the federal government and its contractors like Parsons-Gilbane, but the threat was never communicated and was not reasonably known to PPG or to Eagle/Axiall.  See id. at ¶ 40.

Eagle/Axiall have raised claims against Parsons-Gilbane under theories of negligence, strict liability pursuant to the pre-1996 version of Louisiana Civil Code article 667 and Louisiana Civil Code article 2317, breach of contract, and indemnity. See id. at ¶¶ 51-85.  Parsons-Gilbane argue that Eagle/Axiall's claims are both untimely and fail to provide sufficient facts or legal

theories to establish viable causes of action.   See Record Document 110-1 at 7.   As such, Parsons-Gilbane move for the dismissal of Eagle/Axiall's claims with prejudice, or alternatively, request that Eagle/Axiall be required to provide a more definite statement of their claims pursuant to Federal Rule of Civil Procedure 12(e).   See id. at 28.

## LAW AND ANALYSIS

### I.      Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The standard for the adequacy of complaints under Rule 8(a)(2) changed from the old, more plaintiff-friendly "no set of facts" standard to a "plausibility" standard found in Bell Atlantic v. Twombly and its progeny. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007).   Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555-556, 127 S.Ct. at 1965. If a pleading only contains "labels and conclusions" and "formulaic recitation of the elements of a cause of action," the pleading does not meet the standards of Rule 8(a)(2).   Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citation omitted).   Courts do not have to accept legal conclusions as facts.   See id.   "Motions to dismiss under Rule 12(b)(6) are rarely granted and generally disfavored."   Rodriguez v. Rutter, 310 F. App'x 623, 626 (5th Cir. 2009) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000)).   However, courts considering a motion to dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially plausible under the Iqbal and Twombly standard to survive such a motion.   See Iqbal, 556 U.S. at 678-679, 129 S.Ct. at 1949-1950.

In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside the pleadings."  Colle v. Brazos County, Tex., 981 F.2d 237, 243 (5th Cir. 1993).   However, the court may consider documents outside of the complaint when they are: (1) attached to the motion to dismiss; (2) referenced in the complaint; and (3) central to the plaintiff's claims.  See Maloney Gaming Mgmt., LLC v. St. Tammany Parish, 456 F. App'x 336, 340-41 (5th Cir. 2011) (citing In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 n. 10 (5th Cir. 2007)); Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010).

Parsons-Gilbane have attached to their motion a report allegedly prepared by Eagle/Axiall's expert, Dr. Srdjan Nesic, to support its motion to dismiss.  See Record Document 167.  Eagle/Axiall object to the use of the report, arguing that it is a matter outside of the pleadings.  See Record Document 126 at 21-22.  Dr. Nesic's report is not attached to Eagle/Axiall's Complaint, but the Complaint does refer to a report by Dr. Nesic.  See Record Document 103 at ¶ 39.  However, the Court has examined Dr. Nesic's report and finds that while relevant to Eagle/Axiall's claims, it is not "central" to their claims.  See Lone Star Fund, 594 F.3d at 387.  The primary questions of the third-party litigation concern (a) whether Eagle/Axiall is a beneficiary of any contract or insurance policy involving Parsons-Gilbane, and (b) whether Parsons-Gilbane introduced the surface water despite a known environmental threat or potential for bacterial contamination such that liability should attach.  The Court is also concerned about the use of an unsworn expert report offered by a defendant in the context of a motion to dismiss when, if considered in the context of a motion for summary judgment, a party offering such an exhibit would be required to provide a method for admissibility.  See Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017).  As such, the Court will not examine the report.

**II.      Whether Eagle/Axiall's claims are perempted by Louisiana Revised Statute 9:2772**

Parsons-Gilbane argue that all of Eagle/Axiall's claims, whether based in contract, tort, or indemnity, are untimely pursuant to Louisiana Revised Statute 9:2772, and must be dismissed. See Record Document 110-1 at 11. "Peremption is a period of time fixed by law for the existence of a right. Unless timely exercised, the right is extinguished upon the expiration of the peremptive period." La. Civ. Code art. 3458. "Peremption may not be renounced, interrupted, or suspended." La. Civ. Code art. 3461. Moreover, the doctrine of *contra non valentum* does not apply to peremption. See Firefighters' Ret. Sys. v. Grant Thornton, LLP, 894 F.3d 665, 673 (5th Cir. 2018) (quoting Reeder v. North, 97-0239 (La. 10/21/97), 701 So.2d 1291).

The statute provides a peremptive period for claims involving deficiencies in the surveying, design, supervision, or construction of immovables or improvements thereon. See La. R.S. 9:2772(A)(1). "The Louisiana legislature enacted La. Rev. Stat. 9:2772 in 1964 to protect building contractors from liability for past construction projects that could extend for an indefinite period of time." Celebration Church, Inc., v. Church Mut. Ins. Co., 16-CA-245 (La. App. 5 Cir. 12/14/16), 216 So.3d 1059, 1062.

Eagle/Axiall assert that their claims against Parsons-Gilbane are not preempted under Louisiana Revised Statute 9:2772 because (a) their claims fall outside the scope of the statute and/or (b) their claims fall within an exception contained in Louisiana Revised Statute 9:2772(I). See Record Document 103 at ¶ 74. The statute has been amended numerous times since its enactment in 1964, including two amendments affecting the peremptive period: (1) a 1999 reduction of the ten-year peremptive period to seven years, and (2) a 2003 reduction of the peremptive period to its current five-year period. See La. R.S. 9:2772; 1999 La. Acts 1024; 2003 La. Acts 919. Eagle/Axiall argue that the Court must apply the pre-1990 version of the statute,

which contained a ten-year preemption period.  See Record Document 126 at 23-24.  Parsons-Gilbane respond that regardless of the version applied, Eagle/Axiall's claims are still perempted because Eagle/Axiall cannot, and has not, alleged that Parsons-Gilbane performed any work at the SPR Sulphur Mines facility after its contract was terminated in 1981.  See Record Document 169 at 9.

The Court will begin by determining which version of the statute is applicable to this case.  As noted above, Eagle/Axiall's Complaint specifically references Contract 1 and Contract 2 between Parsons-Gilbane and the federal government that allegedly govern Parsons-Gilbane's activities at the Sulphur Mines.  See Record Documents 1-4 and 1-7.  Contract 2, which replaced Contract 1, contains an estimated completion date of April 30, 1981.  See Record Document 1-7 at 2.  Because peremption begins to run at the time set forth in the relevant statute, it is most reasonable to apply the version of the statute existing at the time Parsons-Gilbane likely executed Contract 2.  See Wilson v. Martco Ltd. P'ship, No. 07-1082, 2003 WL 11393109, at *3 (W.D. La. July 17, 2008).  As such, it is appropriate for the Court to apply the version that became effective on July 10, 1979.  See La. Acts No. 329 (1979).

The 1979 version of Louisiana Revised Statute 9:2772[5] [6]is as follows:

A.      No action whether ex contractu, ex delicto or otherwise, to recover on a contract or to recover damages shall be brought against any person performing or furnishing the surveying, marking, and related services preparatory to

---

[5]  This version of the statute used the terms "pre-emptive" and "pre-empted" throughout.  Later amendments to the statute substituted the terms "peremptive" and "perempted."  See Moll v. Brown & Root, Inc., 218 F.3d 472, 474 n. 1 (5th Cir. 2000).

[6] The Court notes that Eagle/Axiall's Complaint contains an allegation that their claims against Parsons-Gilbane fall within an exception contained in Louisiana Revised Statute 9:2772(I).  See Record Document 103 at ¶ 74.  Subsection (I) was added to Section 9:2772 in 1990.  See 1990 La. Acts No. 712.  As noted above, the Court will apply the version of the statute as it existed in 1979.  As such, Subsection (I) is not applicable to this case.

construction or the design, planning, supervision, inspection or observation of construction or the construction of an improvement to immovable property:

(1)     More than ten years after the date of registry in the mortgage office of acceptance of the work by owner; or

(2)     If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than ten years after the improvement has been thus occupied by the owner;

(3)     If the person furnishing the surveying, marking, or related services or the design and planning does not perform any inspection of the work, more than ten years after he has completed the surveying, marking, or related services or the design and planning with regard to actions against that person.

B.     The causes which are pre-empted within the time described above include any action:

(1)     For any deficiency in the surveying, marking, and related services  or    in the  design,  planning,  inspection,  supervision  or  observation  of construction or in the construction of an improvement to immovable property;

(2)     For damage to property, movable or immovable, arising out of any such deficiency;

(3)     For injury to the person or for wrongful death arising out of any such deficiency; and

(4)     Any action brought against a person for the action or failure to act of his employees.

This pre-emptive period shall extend to every demand whether brought by direct action or for contribution or indemnity or by third party practice, and whether brought by the owner or by any other person.

C.     If such an injury to the property or to the person or if such a wrongful death occurs during the ninth year after the date set forth in Sub-section A, an action to recover the damages thereby suffered may be brought within one year after the date of the injury, but in no event more than eleven years after the date set forth in Sub-section A (even if the wrongful death results thereafter).

D.     Actions for the causes enumerated in Sub-section B of this Section, against the persons enumerated in Sub-Section A of this Section, shall prescribe by the applicable prescriptive periods established by law for such actions.

E.     The pre-emptive period provided by this Section shall not be asserted by way of defense by a person in possession or control, as owner, lessor, tenant, or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury, damage, or death sued upon with regard to any cause of action arising out of the alleged delict, quasi

delict, or obligation of any such person arising out of his possession or control of the property.

F.     Nothing in this Section shall be construed as modifying the liability or responsibility otherwise imposed by law on the owner of an immovable or the possessor, lessor or lessee of an immovable, by reason of the design, planning, supervision, inspection or observation of construction, or construction of improvements to immovable property.

G.     Causes of action arising from the surveying, marking, and related services preparatory to construction which exist prior to the effective date of the 1979 Regular Session amendment to this Section shall be pre-empted one year from said date or by the applicable pre-emptive period established by this section, whichever is later.

See La. R.S. 9:2772 (1964) as amended by 1979 La. Acts 329.   Pursuant to the language of the statute in 1979, a ten-year peremptive period applies.

Parsons-Gilbane maintain that all of Eagle/Axiall's claims are perempted under any version of Louisiana Revised Statute 9:2772 because the peremptive period began to run when Parsons-Gilbane completed work at the mines on or about April 30, 1981.  See Record Document 110-1 at 14.  Alternatively, Parsons-Gilbane contend that the peremptive period was triggered when the federal government accepted their work, and then continued to operate the Sulphur Mines until 1994, when the SPR site was closed and PPG took over possession.  See id.; Record Document 167 (Expert Report of Dr. Srdjan Nesic).[7]  Moreover, Parsons-Gilbane argue that Eagle/Axiall cannot and do not allege that the federal government rejected or failed to take possession of the work it performed.  See Record Document 110-1 at 14.  Thus, Parsons-Gilbane argue that all of Eagle/Axiall's claims were perempted on April 30, 1986, five years (or alternatively, Apirl 30, 1991, ten years) after the project was complete and the government accepted their work.  See id. at 15; Record Document 169 at 9.  Finally, Parsons-Gilbane note

---

[7] Parsons-Gilbane rely upon the report of Eagle/Axiall's expert, Dr. Srdjan Nesic, to establish this date.  As noted above, the Court has declined to review that document in the context of this 12(b)(6) motion.

that the federal government closed the site in 1994, which is well beyond the peremptive period. See Record Document 169 at 9.

Eagle/Axiall respond that Louisiana Revised Statute 9:2772 and its peremptive period apply strictly to those claims arising out of a deficiency in the construction of an improvement to immovable property, not as a limitation to "every action against someone who once built a building."  Record Document 126 at 24.  Moreover, Eagle/Axiall argue that their Complaint does not allege claims that arise from deficiencies with design or construction, but instead derive from Parsons-Gilbane's alleged negligent operation of the Sulphur Mines and breach of contractual obligations by introducing untreated surface water into the brine caverns, resulting in microbiologically influenced corrosion in the caverns and downstream pipelines.  See id. at 25 (quoting the Complaint at ¶¶ 38, 75).

In response, Parsons-Gilbane contend that as construction manager for the SPR program, their responsibilities covered various aspects of construction, all of which are contemplated by the statute.  See Record Document 169 at 11.  As for Eagle/Axiall's argument regarding alleged negligent operation of the SPR site, Parsons-Gilbane argue that any construction project of such size and scale as the SPR project will necessarily entail certain elements of operational and maintenance activities.  See id. at 12.

Upon review of Eagle/Axiall's Complaint, taking all facts as true, the Court finds that the Complaint raises allegations regarding Parsons-Gilbane's alleged operation of the Sulphur Mines, not solely construction activities related to the SPR project.  See Record Document 103 at ¶¶ 8, 22, 38, 75.   The plain language of the 1979 version of the statute indicates that it is applicable to "performing or furnishing the design, planning, supervision, inspection or observation of construction or the construction of an improvement to immovable property…."

15

See La. R.S. 9:2772 (1964) as amended by 1979 La. Acts 329.  At this point in the litigation, the Court cannot conclude, based on the allegations in the Complaint, that the alleged introduction of untreated surface water was a part of the construction project rather than separate operational activities unrelated to construction.

To the extent Eagle/Axiall have asserted construction related claims, such claims are perempted under the 1979 statute.  Eagle/Axiall attached to their Complaint a SPR Exercise Report dated October 16, 1987, which details the use of the Sulphur Mines for Department of Energy purposes, including the storage of sour crude oil in support of the SPR project.  See Record Document 103-6.  Pursuant to the statute, the peremptive period begins to run from the date of acceptance of the work by the owner, or if no acceptance has been recorded, within six months from the date the owner took possession in whole or in part.  See La. R.S. 9:2772(A)(1) and (2).  Based on the October 16, 1987, date in the Exercise Report, it is clear that the Department of Energy was in possession of the Sulphur Mines construction project at that time.  As such, all of Eagle/Axiall's construction related claims would be perempted as of April 16, 1998 under the plain language of the statute.

## III.    Whether Eagle/Axiall's claims are prescribed

Parsons-Gilbane argue further that all of Eagle/Axiall's claims which are not perempted are nevertheless prescribed and should be dismissed.  See Record Document 110-1 at 16.  "Liberative prescription is a mode of barring actions as a result of inaction for a period of time."  La. Civ. Code art. 3447.  The amount of time differs depending on the type of claim involved.  When considering the issue of prescription, courts "should resolve doubts about a prescription question in favor of giving the litigant his day in court."  H.H. White, LLC v. Hanover Ins. Co., 559 F.Supp.2d 714, 716 (E.D. La. May 29, 2008) (quotation omitted).  "Prescriptive statutes are

strictly construed against prescription and in favor of the obligation sought to be extinguished." Id. (quotation omitted).  In the context of a Rule 12(b)(6) motion, dismissal is appropriate only if prescription is evident from a plaintiff's pleadings and no basis for tolling has been raised by the plaintiff.  See Jones v. Alcoa, Inc., 339 F.3d 359, 366 (5th Cir. 2003).  In general, the party asserting prescription has the burden of proof.  See Boutte v. Lafitte Guest House Prop., LLC, No. 15-7005, 2016 WL 1704595 at *2 (E.D. La. Apr. 28, 2016).  However, if a claim is prescribed on the face of the complaint the burden shifts to the plaintiff to show an interruption or suspension of prescription.  See id.

### A.    Eagle/Axiall's tort claims

Eagle/Axiall have alleged several delictual claims against Parsons-Gilbane, including negligence and strict liability.  See Record Document 103-1 at ¶¶ 51-76.  "Delictual actions are subject to a liberative prescription of one year.  This prescription commences to run from the day injury or damage is sustained."  See La. Civ. Code art. 3492.  In cases where the alleged "damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired knowledge of the damage." See La. Civ. Code art. 3493.[8]

Parsons-Gilbane argue that regardless of whether the pipeline is movable or immovable property, Eagle/Axiall's delictual claims are prescribed because Eagle/Axiall's predecessor in interest, PPG, was constructively aware that its pipelines were leaking and that the leaks were attributable to microbial agents in the late 1990s, but PPG failed to file suit.  See Record Document 110-1 at 18.  Relying on the expert report of Dr. Nesic, Parsons-Gilbane argue that in 2004, PPG took measurers to deal with the aggressive bacteria causing the internal corrosion,

---

[8]  The parties did not brief the Court as to whether the pipelines in question should be considered immovable or movable property under the Louisiana Civil Code.

and should have filed suit within one year of acquiring such knowledge.  See id.  Alternatively, Parsons-Gilbane argue that, at a minimum, Eagle/Axiall certainly had sufficient information to be put on notice of damage to their pipelines after they were named as defendants in the underlying litigation in 2014.  See id. at 19.  Even so, Parsons-Gilbane note that Eagle did not file its third-party claims until February 28, 2018, while Axiall filed its third-party claims on November 12, 2019.  See id.

Eagle/Axiall maintain that all tort-based indemnity and contribution claims are not prescribed because prescription does not begin to run until they have suffered a loss.  See Record Document 129 at 34.  A claim for indemnity is a separate substantive cause of action from an underlying tort claim, such that prescription on an indemnity claim does not commence until such time as the party claiming indemnity or contribution has "sustained a loss, either through payment, settlement, or an enforceable judgment…."  See Reggio v. E.T.I., 2007-1433 (La. 12/12/08), 15 So.3d 951, 957-58.  The Court agrees with Eagle/Axiall that, based on the allegations in their Complaint, prescription has not begun to run on their indemnity or contribution claims because they have yet to suffer a loss given the pending nature of the underlying litigation.[9]

Eagle/Axiall argue that the Court should not find that their claims for negligence, strict liability, or any other tort claim are prescribed because the commencement of prescription is not apparent from the face of the Complaint.  See Record Document 126 at 35.  As noted above,

---

[9]  Parsons-Gilbane note for the Court that indemnity is not permitted for a party that is negligent in causing the initial harm, like Eagle/Axiall.  See Record Document 169 at 16.  This is a correct statement of the law.  A party seeking indemnification must be without fault.  See Nassif v. Sunrise Homes, Inc., 98-3193 (La. 6/29/99), 739 So.2d 183, 185.  However, at this point in the litigation, the Boudreauxs have merely alleged negligence on the part of Eagle/Axiall.  It has not been determined that Eagle/Axiall acted negligently.

Parsons-Gilbane rely on a report of Eagle/Axiall's expert witness, Dr. Nesic, to attempt to establish constructive knowledge of the leaks in the pipelines as far back as 2004.  See Record Document 110.  Having excluded Dr. Nesic's report, the Court cannot rely on the 2004 date for the commencement of prescription of Eagle/Axiall's remaining tort claims.  This is a question more appropriate for summary judgment.[10]

**B.      Eagle/Axiall's breach of contract claims**

Parsons-Gilbane also move for the dismissal of Eagle/Axiall's breach of contract claims, arguing that all claims are prescribed.  See Record Document 110-1 at 16.  Breach of contract claims are personal actions subject to a ten-year liberative prescription period.  See La. Civ. Code art. 3499; Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 886 (5th Cir. 2002).  The prescriptive period for a breach of contract claim begins to run from the time of the breach or the time the cause of action arises.  See Richard v. Wal-Mart Stores, Inc., 559 F.3d 341, 345 (5th Cir. 2009).  Parsons-Gilbane dispute the existence of a contractual relationship with Eagle/Axiall or their predecessors in interest, but argue that if such a contract existed, any breach must have occurred by April 30, 1981, the last day that Parsons-Gilbane worked at the Sulphur Mines, such that any contract claim would have prescribed on April 30, 1991.  See Record Document 110-1 at 17.

The Court presumes that the "April 30, 1981" date was taken from Contract 2.  However, it is not clear from the Complaint or attached documents that April 30, 1981, was indeed that last

---

[10] Parsons-Gilbane also argue that at a minimum, Eagle/Axiall certainly became aware that their pipelines were leaking when the Boudreauxs filed their lawsuit in May 2014, but failed to file a Third-Party Complaint until February 2018, such that Eagle/Axiall's claims are prescribed.  See Record Document 110-1 at 19.  Eagle/Axiall respond by noting that they have alleged that Parsons-Gilbane are jointly and solidarily liable under pre-tort reform Louisiana law, such that the Boudreauxs' lawsuit interrupted prescription.  See Record Document 126 at 36.  The briefing by both sides on this particular point is insufficient for the Court to determine whether Eagle/Axiall's claims are prescribed on this basis.

day that Parsons-Gilbane actually performed work at the mines such that the date may operate as the date of the alleged breach.  Contract 2 indicates that April 30, 1981, was the estimated completion date.  The Court cannot rely on an uncertain date in the context of a Rule 12(b)(6) motion.

IV.    **Whether Eagle/Axiall fail to state a claim for breach of contract**

Parsons-Gilbane argue that Eagle/Axiall have failed to properly state a claim for breach of contract based on the Accommodation Agreement and/or the SPR Contracts.  See Record Document 110-1 at 19-20.  Parsons-Gilbane argue that they cannot be held liable for a breach of the Accommodation Agreement because they were not parties to that agreement, which was executed between the United States of America, Allied, and PPG.  See id.  Parsons-Gilbane also note that although its companies did enter into SPR Contracts with the United States of America, neither Eagle/Axiall nor its predecessor, PPG, were a party.  See id. at 20.  Thus, Parsons-Gilbane argue that there is no privity of contract.  See id.  Additionally, Parsons-Gilbane argue that Eagle/Axiall have failed to properly assert that they are third-party beneficiaries of the SPR contracts because they have failed to cite a provision or clause that directly stipulates a benefit in their favor as required for a *stipulation pour autrui*.  See id. at 21-22.

Eagle/Axiall respond by noting their Complaint states that although Parsons-Gilbane were not parties to the Accommodation Agreement, it was contractually obligated as a condition of the SPR Contracts to fulfill certain requirements contained within the Accommodation Agreement, in particular, the insurance requirements, as a condition for its operations at the Sulphur Mines.  See Record Document 126 at 38.  Eagle/Axiall further allege that the United States Department of Energy required Parsons-Gilbane to secure and maintain insurance with limits of at least $10,000,000 covering and naming Allied and PPG as additional insureds as

specified by the Accommodation Agreement.   See id. at 39.   Eagle/Axiall note that their allegations were based on information and belief that Parsons-Gilbane would have been required to maintain such coverage based on the SPR Contracts, the Department of Energy Program Stewardship Report dated January 25, 1979, and the declaration of a retired Department of Energy Contract Specialist familiar with Parsons-Gilbane's involvement with the SPR Sulphur Mines site.  See id. at 40, Exhibit A.

As noted above, the Accommodation Agreement is a contract between the United States and Eagle/Axiall's predecessors in interest, Allied and PPG.  The only contracts provided to the Court at this point in the litigation to which Parsons-Gilbane were parties are the SPR contracts with the United States.   Parsons-Gilbane cannot breach the Accommodation Agreement because they were not a party to the contract, and there is no allegation that Parsons-Gilbane ever entered directly into a contract with PPG or Allied.   Thus, the Court agrees that the only basis for Eagle/Axiall to properly state a breach of contract claim against Parsons-Gilbane is as a third-party beneficiary of a *stipulation pour autrui*.

The Louisiana Civil Code provides that a contract benefitting a third party may exist.  See La. Civ. Code arts. 1978-1982.[11]  Such a contract is known as a *stipulation pour autrui*.  See Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary, 2005-2364 (La. 10/15/06), 939 So.2d 1206, 1211.  However, the code does not provide an analytical framework to determine when such a contract exists.  See id. at 1212.   A determination must be made on a case-by-case basis. See id.   The current jurisprudence provides "three criteria for the Court to consider in

---

[11] At the time that the SPR contracts and the Accommodation Agreement were signed, Louisiana Civil Code article 1890 controlled contracts on behalf of third-party beneficiaries.  The 1984 revision noted in current article 1978 contains the following comment: "(a) This Article reproduces the substance of C.C. Arts. 1890 and 1902 (1970).  It does not change the law."  See La. Civ. Code art. 1978, comment (a).

determining whether the contracting parties have provided a benefit to a third party: (1) the stipulation for a third party is manifestly clear; (2) there is certainty as to the benefit provided [to] the third party; and (3) the benefit is not a mere incident of the contract between the promisor and the promisee." Id.   "A stipulation pour autrui is never presumed." Id. "The party claiming the benefit bears the burden of proof."  Id. (citing La. Civ. Code art. 1831).

The Court must determine whether Eagle/Axiall have presented a facially plausible claim of its status as a third-party beneficiary to contracts executed by Parsons-Gilbane.   After examining other documents attached to the Complaint, the Court is of the opinion that Eagle/Axiall have stated a plausible claim.  The Accommodation Agreement, although executed after the SPR contracts in February 1979, states that "[t]he United States agrees to include in the Sulphur Mines project SM-1, ESR Complex the following insurance requirements…. Policies … shall be endorsed to name Allied and PPG as additional named insureds."  Record Document 103-1 at 14.  The Court reads this clause as an obligation undertaken by the United States to ensure that PPG and Allied were named as additional insureds during the scope of the Sulphur Mines project, not that the United States would necessarily provide the insurance coverage.  This clause is supported by a contemporaneous Department of Energy document entitled "Program Stewardship Report – SPR Status and Issues," which discusses a delay in the acquisition of the Sulphur Mines site caused by negotiations of insurance and liabilities.  See Record Document 103-2 at 7.  The report goes on to state: "this issue has been resolved by requiring the dome site construction contractor to increase coverage from $7,000,000 to $10,000,000 and to add Allied and PPG as additional named insureds."   As noted above, the Department of Energy selected Parsons-Gilbane to serve as the SPR dome site contractor.

Assuming all facts as true for the purposes of this motion, the Court finds that the combination of these two contemporaneous documents attached to Eagle/Axiall's Complaint along with the allegations contained in the Complaint, are sufficient to allege that an agreement of some sort was made between the United States and Parsons-Gilbane regarding additional insurance coverage for Allied and PPG as mentioned in the Program Stewardship Report.  If such an agreement was made, PPG and Allied, and thus Eagle/Axiall, may indeed be third-party beneficiaries of any such agreement.  This is sufficient to deny dismissal of Eagle/Axiall's claim and allow the matter to proceed to discovery.

## V.     More definite statement pursuant to Rule 12(e)

Parsons-Gilbane request that the Court order Eagle/Axiall to provide a more definite statement of their claims.  See Record Document 110.  Under Rule 12(e) of the Federal Rules of Civil Procedure, a defendant may move for a more definite statement of a pleading "which is so vague or ambiguous that the party cannot reasonably prepare for a response." Fed. R. Civ. P. 12(e).  "Although Rule 12(e) motions are an available remedy, motions for more definite statements are generally disfavored because of the liberal pleading standard set forth in Rule 8." Arceneaux v. Blanchard Contractors, No. 13-4841, 2013 WL 5329898 at *1 (E.D. La. Sept. 29, 2013) (quotation omitted).   Relief under Rule 12(e) is limited to cases where the "complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed…." Williams v. Baton Rouge Police Dept., No. 17-00165, 2017 WL 6045437 at * 1 (M.D. La. Dec. 6, 2017).

The Court finds that the Complaint is sufficient to allow a responsive pleading to be framed.  Therefore, a more definite statement pursuant to Rule 12(e) is not required in this case.

**CONCLUSION**

Based on the foregoing reasons, the Motion to Dismiss for Failure to State a Claim, or alternatively, Motion for More Definite Statement (Record Document 110) is hereby **GRANTED IN PART** and **DENIED IN PART**.    The motion is **GRANTED** as to Eagle/Axiall's claims related to the construction of the SPR site by Parsons-Gilbane because such claims are perempted by Louisiana Revised Statute 9:2772.    The remainder of Parsons-Gilbane's motion is **DENIED**.

**THUS DONE AND SIGNED**, this 30th day of September, 2021.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE