UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

---

| | |
|---|---|
| ROBERT LEE BOUDREAUX | CIVIL ACTION NO. 18-0956 |
| VERSUS | JUDGE DONALD E. WALTER |
| AXIALL CORP., ET AL. | MAGISTRATE JUDGE KAY |

---

## MEMORANDUM RULING

Before the Court is a Motion to Dismiss Pursuant to Rule 12(b)(6), or, in the alternative, Rule 12(e) Motion for More Definite Statement filed by Third-Party Defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Lexington Insurance Company ("Lexington"), and Granite State Insurance Company ("Granite"). See Record Document 111. Third-Party Plaintiffs, Eagle US 2 LLC, Axiall Corporation, and Axiall, LLC (herein collectively "Eagle/Axiall") oppose the motion. See Record Document 124. For the reasons assigned herein, Third-Party Defendants' motion is hereby **DENIED**.

## BACKGROUND INFORMATION[1]

This motion relates to Third-Party litigation, which alleges that certain Third-Party Defendants may be held liable for the underlying cause of leaks from certain pipelines upon property purportedly owned by Robert Boudreaux ("Boudreaux"). Boudreaux filed suit against Eagle/Axiall as the current owners of the pipelines in question. Eagle/Axiall's Second Supplemental and Amended Third Party Complaint (henceforth "Complaint") sets forth theories of liability against Parsons Government Services, Inc., Gilbane Building Company, and Gilbane Inc. (collectively "Parsons-Gilbane"), their alleged insurers (National Union, Lexington, and Granite), and Boeing Petroleum Services, Inc. ("BPS"), which stem from the use of the salt

---

[1] This case has a lengthy procedural history. The most recent recitation is found in Record Document 243.

dome mines in Sulphur, Louisiana, by the federal government for oil storage in the late 1970s and early 1980s in connection with the Strategic Petroleum Reserve ("SPR") program. See Record Document 103. During that time period the salt mines were owned by Allied Chemical Corporation ("Allied"), who leased the exclusive right to drill, mine, and produce salt brine to PPG Industries, Inc. ("PPG").[2] See Record Document 103-1. PPG is the corporate predecessor to Eagle. See Record Document 103 at ¶ 5.

It is alleged that Parsons-Gilbane was selected by the Department of Energy to construct and operate underground oil storage reserve facilities in Louisiana and Texas, including the Sulphur mines at issue in this case. See id. at ¶ 8.[3] Thereafter, it is alleged that Parsons-Gilbane became the prime contractor and manager of the project, making it responsible for, among other things, selecting subcontractors, reviewing construction designs, construction schedule control, construction and material inspection, environmental monitoring, the review of designs and contracts, construction planning estimates, scheduling and cost control, labor relations, and safety programs. See id. at ¶¶ 8-9.

It is alleged that the federal government executed an "Accommodation Agreement" dated February 2, 1979, with Allied and PPG setting forth the government's intention to acquire large portions of the mines through the use of eminent domain. See id. at ¶ 10; Record Document 103-1. The Accommodation Agreement also allegedly contains a provision requiring PPG to be kept whole and insured for any property damage as a consequence of the SPR construction and operations at the Sulphur mines. See id. Further, it is alleged that the Accommodation

---

[2] On January 22, 2013, PPG sold the pipelines in question to Eagle. See Record Document 103 at ¶ 5; Record Document 103-3.

[3] It is alleged that The Ralph M. Parsons Company, the predecessor in interest to Parsons Government Services, Inc., Gilbane Building Company and/or Gilbane, Inc., formed a joint venture and/or partnership for the purpose of the SPR project at the Sulphur mines. See Record Document 103 at ¶ 3.

Agreement required assurances that Allied and PPG would be held harmless for any activities beyond what the Department of Energy could legally grant. See Record Document 103 at ¶ 11.

This was allegedly resolved by the Department of Energy requiring Parsons-Gilbane to increase insurance coverage from $7,000,000 to $10,000,000, and to add Allied and PPG as additional named insureds. See id.; Record Document 103-2. To support this allegation, Eagle/Axiall attached to their Complaint a document entitled "Program Stewardship Report – SPR Status and Issues" dated January 25, 1979. See Record Document 103-2. The report contains the following language: "Site Acquisition slipped from 12-1-78 … to projected 2-1-79… the major issue that delayed the completion of the negotiations was that of insurance and liabilities. Allied and PPG required assurance that they would be held harmless beyond what the Department of Energy can legally grant. This issue has been resolved by requiring the dome site construction contractor to increase coverage from $7,000,000 to $10,000,000 and to add Allied to [sic] PPG as additional named insureds." See id. at 7.

The terms of the Accommodation Agreement also allegedly required careful coordination of all operations between the SPR, Allied, and PPG regarding the development of replacement salt brining caverns, and also allowed any cavern deemed necessary to be filled with oil. See Record Document 103 at ¶ 12. Finally, it is further alleged that, pursuant to the Accommodation Agreement, before PPG could resume brining operations in any cavern, Parsons-Gilbane was required to install and connect piping and fittings in a workmanlike manner at no cost or liability to Allied or PPG. See id. Eagle maintains that on January 22, 2013, PPG assigned and conveyed all right, title, and interest in the Accommodation Agreement to Eagle and its related companies. See id. at ¶ 13.

3

Parsons-Gilbane allegedly entered at least two contracts (herein "SPR contracts") with the Department of Energy during its time serving as construction manager, which allegedly provide direct and indirect benefits to Eagle/Axiall as successors in interest to PPG. See id. at ¶ 14; Record Document 1-4; Record Document 1-7.  It is alleged that a contract dated March 18, 1977 ("Contract 1") contains provisions requiring Parsons-Gilbane to "protect the Government's property and all adjacent property from injury arising out of the furnishing of general condition items."  See Record Document 103 at ¶ 14; Record Document 1-4 at 35-36.[4]  It is also alleged that Contract 1 contained by reference a standard Federal Energy Administration General Provision entitled "Insurance–liability to third persons."   See Record Document 103 at ¶ 16; Record Document 1-4 at 66.

By letter dated January 19, 1978, the federal government terminated Contract 1 and immediately awarded to Parsons-Gilbane a second contract ("Contract 2"), which provided for a continuation of the services detailed in Contract 1.  See Record Document 103 at ¶ 17; Record Document 1-5.  It is alleged that Contract 2 states that Parsons-Gilbane was retained to oversee the design, long-lead material purchasing and control, construction and operation effort, and to furnish the overall management and coordination of the construction of the SPR facilities, including the Sulphur mines.  See Record Document 103 at ¶¶ 19-20; Record Document 1-7 at 28-29.

Eagle/Axiall contend that Contract 2 also required Parsons-Gilbane to procure and maintain certain bonds and insurance to cover third-party property damage caused by its operations and activities at the Sulphur mines.  See Record Document 103 at ¶¶ 24-26; Record

---

[4] "General condition items" are defined as "items which … do not lend themselves readily to inclusion in one of the separate contracts"… and may include "…general maintenance; subsoil exploration; refuse disposal; …storage on-site or off-site of long lead procurement items; and miscellaneous minor construction work when it is not feasible for the Government to secure competitive bids or proposals thereon."  Record Document 103 at ¶¶ 14-15.

4

Document 1-6 at 72-73; Record Document 1-8 at 43.  Eagle/Axiall state they "have been informed and thus believe and assert that Parsons-Gilbane was required by the SPR Contracting Officer to secure and maintain insurance" that would have covered the property of PPG and Allied, including the pipelines at issue in this case.  See id. at ¶ 27.  It is also alleged that as a standard business practice Parsons-Gilbane would have required its subcontractors to provide appropriate insurance.  See id. at ¶ 28.

Eagle/Axiall assert that the Accommodation Agreement and Contracts 1 and 2 demonstrate an intention to extend insurance obligations in favor of PPG.  See id. at ¶¶ 28-29. As noted above, PPG allegedly assigned its rights in the Sulphur mines, including the pipelines in question, to Eagle in 2013.  Thus, Eagle/Axiall assert that Parsons-Gilbane and their alleged insurers (National Union, Lexington, and Granite) are liable to them under the terms of the Accommodation Agreement, SPR Contracts (Contracts 1 and 2), and the related insurance policies for the damage described herein.  See id. at ¶ 31.

Eagle/Axiall allege that National Union issued insurance policies to cover the SPR operations of its insured, Parsons-Gilbane, including numerous Comprehensive Liability Policies.  See id. at ¶¶ 32-33; Record Document 103-4.  Each of the policies allegedly provide occurrence-based coverage and "defense obligations for third-party property damages 'including liability assumed under contract.'"  See Record Document 103 at ¶ 34.  Eagle/Axiall note that each of the National Union policies include a provision stating that "the unqualified word 'insured' includes the insured name and also includes … any person or organization to whom the named insured is obligated by a written contract… to provide insurance such as is afforded by this policy…."  See id. at ¶ 35.  Eagle/Axiall state that, on information and belief, additional insurance policies exist that provide similar coverage for third-party damage.  See id. at ¶ 36.

5

Eagle/Axiall allege that they were damaged when Parsons-Gilbane and/or its agents, employees, and subcontractors constructed and operated the Sulphur mines negligently and in breach of contractual obligations owed to PPG to perform work in a workmanlike manner. See id. at ¶ 38. Specifically, it is alleged that damage was caused by the introduction of untreated water from the Sabine River Diversion Canal, which resulted in microbiologically influenced corrosion in the pipelines at issue in the underlying litigation. See id. Eagle/Axiall assert that Parsons-Gilbane is responsible for using untreated water in its operations. See id. at ¶ 39. Eagle/Axiall claim that the potential for bacterial contamination was known to the federal government and its contractors like Parsons-Gilbane, but the threat was never communicated and was not reasonably known to PPG. See id. at ¶ 40.

Eagle/Axiall have asserted claims against National Union, Lexington, and Granite pursuant to Louisiana's Direct Action Statute (La. R.S. 22:1269) based on the alleged acts of their insured, Parsons-Gilbane, in relation to the SPR project. See id. at ¶¶ 86-95. Eagle/Axiall also allege a lack of good faith and fair dealing by the insurers as required by Louisiana Revised Statute 22:1973. See id. at ¶¶ 96-107. Finally, Eagle/Axiall assert a claim pursuant to Louisiana Revised Statute 22:1892 for failure to pay the amount of the claim within thirty days of receiving satisfactory proof of loss. See id. at ¶¶ 108-111. National Union, Lexington, and Granite move for the dismissal of Eagle/Axiall's claims pursuant to Rule 12(b)(6), or alternatively, a more definite statement pursuant to Rule 12(e). See Record Document 111 at 2.

## LAW AND ANALYSIS

**I.      Federal Rule of Civil Procedure 12(b)(6).**

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." The standard for the adequacy of complaints under Rule 8(a)(2) changed from the old, more plaintiff-friendly "no set of facts" standard to a "plausibility" standard found in Bell Atlantic v. Twombly and its progeny. Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007). Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555-556. If a pleading only contains "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," the pleading does not meet the standards of Rule 8(a)(2). Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citation omitted). Courts do not have to accept legal conclusions as facts. See id.

"Motions to dismiss under Rule 12(b)(6) are rarely granted and generally disfavored." Rodriguez v. Rutter, 310 F. App'x 623, 626 (5th Cir. 2009) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2009)). However, Courts considering a motion to dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially plausible under the Iqbal and Twombly standard to survive such a motion. See Iqbal, 556 U.S. at 678-679, 129 S.Ct. at 1949-1950.

In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside the pleadings." Colle v. Brazos Cty., Tex., 981 F.2d 237, 243 (5th Cir. 1993). However, the court may consider documents outside of the complaint when they are: (1) attached to the motion to dismiss; (2) referenced in the complaint; and (3) central to the plaintiff's claims. See Maloney Gaming Mgmt., LLC v. St. Tammany Parish, 456 F. App'x 336, 340-41 (5th Cir. 2011) (citing In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)); Lone Star Fund V (U.S.), LP v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010).

**II.     Whether Eagle/Axiall have properly asserted claims against National Union, Lexington, and Granite.**

Eagle/Axiall allege that National Union, Lexington, and Granite are liable for the damages asserted by Boudreaux. See Record Document 103 at ¶ 87. Further, Eagle/Axiall contend that National Union, Lexington, and Granite owe them a duty to defend and indemnify against Boudreaux's claims. See id. at ¶ 91. Eagle/Axiall claim that this duty arises from language such as that contained in the National Union policies that would cover them as "additional insureds" under the policies. See id. Moreover, Eagle/Axiall contend that National Union, Lexington, and Granite are liable to them because of "occurrences" of property damage arising during the policy periods. See id. at ¶ 94.

Eagle/Axiall have asserted their claims against National Union, Lexington, and Granite under Louisiana's Direct Action Statute for property damage allegedly caused by their insured, Parsons-Gilbane. See id. at ¶ 87. "The purpose of [Louisiana's] Direct Action Statute is to provide liability coverage for the benefit of injured parties where there exists a contract of liability coverage between an insured and insurance company." First Am. Title Ins. Co. v. Cont'l Cas. Co., 709 F.3d 1170, 1173 (5th Cir. 2013) (citation omitted); La. R.S. 22:1269. "To that end, the Direct Action Statute provides that an 'injured person… shall have a right of direct action against the insurer [of any person liable for the injury at issue] within the terms and limits' of an insurance policy." Id. (quoting La. R.S. 22:1269(B)(1)). The statute does not extend the protection offered under a policy. See id. It merely provides a direct cause of action to injured third parties for claims falling within the terms and limits of the insurance policy in question. See id.

The Direct Action Statute is generally limited to persons injured by tortious conduct, not as a result of a breach of contract. See Mentz Const. Servs., Inc. v. Poche, 2011-1474 (La. App.

4 Cir. 3/14/12), 87 So.3d 273, 276. However, a lawsuit that sets forth numerous theories of recovery, including tort, may in certain circumstances proceed under the Direct Action Statute.[5] See Orleans Parish Sch. Bd. v. Chubb Custom Ins. Co., 162 F. Supp. 2d 506, 516 (E.D. La. 2001). The Direct Action Statute is also limited to those situations in which the plaintiff is not a named "insured" under the policy or where no privity of contract exists between the plaintiff and the insurer. See Perkins v. Carter, 09-673 (La. App. 5 Cir. 12/29/09), 30 So.3d 862, 866.

A plaintiff has standing to sue under an insurance policy without the need for the Direct Action Statute if the plaintiff is a named insured, additional named insured, or is intended as a third-party beneficiary. See Axis Surplus Ins. Co v. Third Millennium Ins. & Fin. Servs., Inc., 781 F. Supp. 2d 320, 323 (E.D. La. 2011). A review of the Complaint reveals that Eagle/Axiall are primarily claiming to be "insureds" or "additional insureds" under the policies in question, which would fall outside the confines of the Direct Action Statute. Eagle/Axiall contend that their predecessor in interest, PPG, was an additional named insured under insurance policies issued by National Union, Lexington, and Granite on behalf of Parsons-Gilbane.[6]

Eagle/Axiall have a heavy burden to ultimately prove that PPG was a third-party beneficiary of the insurance policies in question. In Louisiana, a contract for the benefit of a third-party is known as a *stipulation pour autrui*. See La. Civ. Code arts. 1978-1982. The current jurisprudence provides "three criteria for the Court to consider in determining whether

---

[5] "When a party has been damaged by the conduct of another arising out of a contractual relationship, the party may have two remedies, a suit in contract or a suit in tort, and he may elect to recover his damages under either of these two actions." Mentz Const. Servs., Inc., 87 So.3d at 276. "[T]he main distinction between an action on a contract and a tort action is that the former flows from the breach of a special obligation contractually assumed by the obligor, whereas the latter flows from the violation of a general duty owed to all persons." Id. at 276-277. "The parties to a contract have a right to elevate a general duty to a contractual obligation by including that duty as a provision of the contract." Id. at 277.

[6] To extent that Eagle/Axiall assert claims for property damage directly against the insurance companies simply as a party injured by Parsons-Gilbane, those claims could be asserted through the Direct Action Statute.

9

the contracting parties have provided a benefit to a third party: (1) the stipulation for a third party is manifestly clear; (2) there is certainty as to the benefit provided [to] the third party; and (3) the benefit is not a mere incident of the contract between the promisor and the promisee." Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary, 2005-2364 (La. 10/15/06), 939 So.2d 1206, 1212. "A *stipulation pour autrui* is never presumed." Id. "The party claiming the benefit bears the burden of proof." Id. In Louisiana, the most common method of establishing a *stipulation pour autrui* in the insurance context is to simply name the third party as an additional insured or beneficiary under the policy. See St. Julian v. Diamond M. Drilling, 403 F. Supp. 1256, 1259 (E.D. La. 1975).

National Union, Lexington, and Granite argue that Eagle/Axiall's Complaint does not contain sufficient allegations to properly state claims for relief. See Record Document 111-1 at 20. The Court will address the arguments of the insurance companies separately.

### A.  Claims against National Union.

The Court will begin by addressing the arguments of National Union. First, National Union contends that Eagle/Axiall have failed to identify relevant provisions of the six general liability policies issued by National Union to Parsons-Gilbane, which are attached to Eagle/Axiall's Complaint. See Record Document 111-1 at 14, 20. National Union also contends that Eagle/Axiall have failed to sufficiently allege that they are entitled to a defense or indemnity under any of the National Union policies attached to the Complaint as a third-party beneficiary. See id. at 26-28. Finally, National Union argues that Eagle/Axiall have not alleged that "property damage," as defined by the policies, occurred during the effective dates of the policies, which is a prerequisite of coverage under the policies. See id. at 27.

In response, Eagle/Axiall argue that their Complaint specifically references the six policies in question, noting that each of the policies provide "occurrence-based" coverage and defense obligations for third-party damages, including for liability assumed under contract. See Record Document 124 at 14. Eagle/Axiall contend that they have alleged that there were occurrences of property damage during the policy periods due to the actions of Parsons-Gilbane. See id. at 15. Additionally, Eagle/Axiall argue that they have alleged that they are additional "insureds" under the policies based on the broad language contained therein and the additional evidence suggesting that PPG was an intended third-party beneficiary based on the SPR contracts and the Accommodation Agreement. See id. at 14-15.

The Court has examined the National Union policies, each of which contain similar clauses of note in relation to this case. First, the Court notes that the policies provide coverage for property damage as follows: "Property Damage Liability: to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages (including liability assumed under contract) because of property damage caused by an occurrence as defined herein."[7] See Record Document 103-4 at 101. Second, the policies define the term "insured" to include "the named insured and also includes…any person or organization to whom the named insured is obligated by virtue of a contract, entered into before loss, to provide insurance such as it is afforded under the policy…." See id. at 103. Third, "Property damage" is defined as "loss of or physical injury to, damage or destruction of tangible property which occurs during the policy period…." See id. at 110. Fourth, "Occurrence" is defined as "an event, including continuous or repeated exposure to conditions, which results, during the policy period, in … property damage which was not intended from the standpoint of the named insured." See id.

---

[7] The Court refers to policy number 1270245 as an example. See Record Document 103-4 at 94-124.

The Court will first address National Union's argument that Eagle/Axiall have failed to sufficiently allege that they are an additional insured as that term is defined by the policies, such that a duty to indemnify or defend would result. All of the National Union policies provided to the Court contain the same definition of "insured" noted above, which "also includes… any person or organization to whom the named insured is obligated by virtue of a contract, entered into before the loss, to provide insurance such as it is afforded under the policy." As noted, Eagle/Axiall have alleged that they are "insureds" as defined by the policy because a contract exists requiring Parsons-Gilbane to provide coverage for PPG. See Record Document 124 at 14-15. The Court previously determined that Eagle/Axiall have presented facially-plausible claims of its status as a third-party beneficiary to insurance contracts executed by Parsons-Gilbane. See Record Document 243 at 22. In reaching that conclusion, the Court found that the combination of the Accommodation Agreement and the Stewardship Report raised sufficient allegations that Parsons-Gilbane had potentially entered into an agreement to provide additional insurance coverage for Allied and PPG. See id. at 23. To ultimately be successful, Eagle/Axiall will have to produce evidence that such a contract exists and that PPG was a third-party beneficiary either as an additional named insured on the policy or that a *stipulation pour autrui* was created. This is a difficult burden. However, the Court finds that Eagle/Axiall have sufficiently raised a claim.

National Union also argues that the burden lies with Eagle/Axiall to prove that the claim they seek to establish arose from an "occurrence" during the time the policies provided coverage, which they have failed to do. See Record Document 111-1 at 27. This is a correct statement of the law. A party seeking coverage has the burden of demonstrating that they are covered by the policy. See Dickerson v. Lexington Ins. Co., 556 F.3d 290, 295 (5th Cir. 2009). However, National Union views the "occurrence" in this case as the moment when the pipelines began to

leak, which was many years after the SPR activities concluded and the coverage provided by the National Union policies had expired.  See Record Document 111-1 at 27.

Eagle/Axiall contend that they have alleged an "occurrence" during the policy periods by asserting that property damage occurred when Parsons-Gilbane negligently introduced untreated surface water containing bacterial microbes into the brine caverns at the Sulphur mines.  See Record Document 124 at 13; Record Document 103 at ¶ 38.  This is sufficient for 12(b)(6) purposes.  Whether Eagle/Axiall will be able to prove that the introduction of the untreated water during the time that Parsons-Gilbane supervised and controlled the Sulphur mines caused "property damage" as that term is defined under the policies necessarily involves questions of fact.  Accordingly, the Court finds that Eagle/Axiall have raised sufficient allegations to state a claim against National Union.

### B. Claims against Lexington and Granite.

Lexington and Granite argue that Eagle/Axiall have failed to identify a policy issued by either company that would require a defense or indemnity of Eagle/Axiall based on Boudreaux's claims in the underlying litigation.  See Record Document 111-1 at 20-21.  Rather, Lexington and Granite contend that Eagle/Axiall's claims "consist solely of legal conclusions masquerading as factual conclusions and threadbare recitals of claims supported by mere conclusory statements" that do not meet the Twombly and Iqbal standards.  See id. at 20-22.

Eagle/Axiall have alleged that Lexington and Granite issued insurance policies "to and for the benefit and coverage of: The Ralph M. Parsons Company, Gilbane Building Company, and/or Parsons Gilbane…; the United States Government; and PPG …."  See Record Document 103 at ¶ 5.  Eagle/Axiall also allege that Granite and Lexington have raised improper objections to discovery requests and have failed to identify or produce any policies.  See id. at ¶ 92.  Based

13

on the alleged lack of timely production, Eagle/Axiall assert that Lexington and Granite have admitted that policies were issued to Parsons-Gilbane naming PPG as an additional insured. See id. at ¶ 90. Eagle/Axiall further allege that they have discovered sufficient parole evidence to establish that Lexington and Granite issued insurance policies to Parsons-Gilbane in relation to the SPR project. See Record Document 103 at ¶ 93; Record Document 103-9. In response, Lexington and Granite argue that the Court should not make a finding that the alleged policies are "deemed admitted" because they were given an open-ended extension of time to supply the policies. See Record Document 111-1 at 19.

The parole evidence attached to Eagle/Axiall's Complaint suggests that Lexington and Granite may have issued excess insurance policies to Parsons-Gilbane in relation to the SPR project. See Record Document 103-9. The parole evidence consists of alleged interrogatory responses filed by Parsons-Gilbane in a personal injury case, Buel M. Brown v. Drillers, Inc., which allegedly occurred at the SPR project, wherein Parsons-Gilbane provided a list of its insurance carriers as of February 9, 1979. See id. at 5-7. The list includes National Union (primary - general liability coverage), Granite (excess coverage), and Lexington (excess coverage). See id. at 5-7. This information combined with the Court's previous determination that Eagle/Axiall have presented a facially plausible claim of its status as a third-party beneficiary to insurance contracts executed by Parsons-Gilbane weigh in favor of denying Lexington and Granite's motion at this time.

In Louisiana, the insured bears the burden of proving a policy of insurance affords coverage, while the insurer bears the burden of proving the applicability of an exclusionary clause within the policy. See Bayle v. Allstate Ins. Co., 615 F.3d 350, 357 (5th Cir. 2010). Eagle/Axiall will be required to prove as part of its prima facie case that PPG is named as an

additional insured or is otherwise a third-party beneficiary under any policy issued by Granite or Lexington. However, Lexington and Granite have not provided Eagle/Axiall with a copy of any policies issued on behalf of Parsons-Gilbane during the time period that Parsons-Gilbane allegedly served as the prime contractor for the SPR project. See Record Document 103-10 at 64-65, 102-103. Lexington and Granite objected to the request for production of the policies as overly broad and unduly burdensome, noting that documents from that time period are not reasonably accessible.[8] See id. at 64 and 102. However, the insurers also noted that, at that time, relevant or responsive policies had not been identified or located, stating that the search remained ongoing. See id. at 65 and 103; Record Document 158 at 4, n. 14.

If the Court had access to the policies in question it could determine whether the policies list PPG as an additional insured or whether language contained therein is sufficient to establish a *stipulation pour autrui*. Without a copy of the policy the Court cannot make that determination. It would also be helpful to the Court if, after a thorough search, Lexington and Granite could assuredly state whether or not policies were issued to Parsons-Gilbane related to the SPR project. Unfortunately, neither of the above alternatives has been presented to the Court. Accordingly, the Court declines to dismiss Eagle/Axiall's claims against Granite and Lexington at this time.

### III. More Definite Statement Pursuant to Federal Rules of Civil Procedure 12(e).

National Union, Lexington, and Granite also request that the Court order Eagle/Axiall to provide a more definite statement of their claims. See Record Document 111. Under Rule 12(e) of the Federal Rules of Civil Procedure, a defendant may move for a more definite statement of a pleading "which is so vague or ambiguous that the party cannot reasonably prepare for a

---

[8] If discovery issues still remain, Granite and Lexington should file an appropriate motion with the Magistrate Judge.

response." Fed. R. Civ. P. 12(e). "Although Rule 12(e) motions are an available remedy, motions for more definite statements are generally disfavored because of the liberal pleading standard set forth in Rule 8." Arceneaux v. Blanchard Contractors, No. 13-4841, 2013 WL 5329898 at *1 (E.D. La. Sept. 29, 2013) (quotation omitted). Relief under Rule 12(e) is limited to cases where the "complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed…." Williams v. Baton Rouge Police Dept., No. 17-00165, 2017 WL 6045437 at *1 (M.D. La. Dec. 6, 2017).

Regardless of the strength of Eagle/Axiall's claims against National Union, Lexington, and Granite, the Court did not experience difficulty in understanding the allegations. As such, the Court finds that the Complaint is sufficient to allow a responsive pleading to be framed. A more definite statement pursuant to Rule 12(e) is not required in this case.

## CONCLUSION

For the reasons stated herein, National Union, Lexington, and Granite's Motion to Dismiss Pursuant to Rule 12(b)(6), or, in the alternative, Rule 12(e) Motion for More Definite Statement (Record Document 111) is **DENIED**.

**THUS DONE AND SIGNED**, this 21st day of March, 2022.

*[signature]*
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE