UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

---

| | |
|---|---|
| ROBERT LEE BOUDREAUX | CIVIL ACTION NO. 18-0956 |
| VERSUS | JUDGE DONALD E. WALTER |
| AXIALL CORP., ET AL. | MAGISTRATE JUDGE KAY |

---

### MEMORANDUM RULING

Before the Court is a Motion for Partial Summary Judgment Based on Compromise filed by Defendants, Eagle US 2 LLC ("Eagle"), Axiall Corporation, and Axiall, LLC (herein "Defendants"). See Record Document 52. Plaintiff, Robert Lee Boudreaux ("Boudreaux") opposes the motion.[1] See Record Document 117. For the reasons assigned herein, Defendants' motion is hereby **GRANTED**.

### BACKGROUND INFORMATION

Robert Boudreaux filed suit against the Defendants for damages allegedly caused by brine leaking from two pipelines transecting his property in Calcasieu Parish, Louisiana.[2] The now defunct pipelines are currently owned by Eagle, a wholly owned subsidiary of Axiall

---

[1] Boudreaux's wife, Shirley Ann Boudreaux, originally joined her husband in filing this lawsuit (collectively "the Boudreauxs"). Mrs. Boudreaux was voluntarily dismissed because it was determined that she does not have an ownership interest in the property in question. See Record Documents 250 and 251.

[2] The parties dispute ownership of the property containing the pipelines. The Defendants' First Supplemental Answer contains a Reconventional Demand challenging the Plaintiffs' purported ownership of the strip of land where the pipelines are located (referred to in this litigation as the Brimstone strip). See Record Document 56-1. Indeed, Defendants allege that Axiall is the owner of the 100 foot strip of land containing the pipelines, having acquired title from Brimstone Railroad and Canal Company, or alternatively, via acquisitive prescription through possession of more than thirty years without interruption. See id. A determination of ownership is not required to consider the pending motion.

Corporation, and were once used to transport brine from the Sulphur salt dome mines to Axiall's chemical plant in Westlake, Louisiana. On May 2, 2014, the Louisiana Department of Environmental Quality ("LDEQ") issued a Compliance Order requiring Eagle to install a new pipeline to replace the two existing pipelines. See Record Document 52-3. As part of the project, Eagle was required by LDEQ to secure the necessary servitudes to allow for the building of the replacement pipeline. See id. at 10.

On May 21, 2014, Boudreaux filed suit against the Defendants. See Record Document 1-1 at 1. Boudreaux alleges that leaks from the two pipelines severely contaminated his land. As such, Boudreaux contends that the Defendants are responsible for all damages arising from the contamination of his land. See Record Document 1-15 at ¶ 38. Boudreaux's complaint states that the damage to his land "is actionable as a tort, a breach of contract, a failure to operate prudently, a failure to maintain *garde* or control of the harmful byproducts or operations, a failure to observe the obligations of neighborhood and other personal or predial servitudes, and a failure to obey any laws under which the [plaintiff is a] third-party beneficiary to contracts between the defendants and others." See id. Boudreaux also alleges that the contamination, and Defendants' failure to remove toxic materials, constitutes a continuing trespass. See id. at ¶ 47. He further alleges that Defendants' actions have created an ongoing and damaging nuisance, and that Defendant's failure to restore his land constitutes a continuing breach of duties imposed by tort law and contract law. See id. at ¶¶ 48-49.[3] Boudreaux seeks compensatory damages in the

---

[3] Boudreaux also asserted a claim against the Defendants under the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"), Louisiana Revised Statute § 51:1401 et seq, claiming that Defendants' conduct regarding the leaking pipelines offends public policy, and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious. See Record Document 1-15 at ¶¶ 54-56. The Court previously granted summary judgment in favor of the Defendants and dismissed this claim with prejudice. See Record Documents 180 and 181. If the

2

amount necessary to put him in the position he was in before the damages occurred, compensation for his loss of use of the land, the cost to restore the land, and attorney's fees. See id. at ¶¶ 50-51.

Before Eagle could proceed with the installation of the replacement pipeline mandated by LDEQ, Eagle was required to secure the necessary servitudes. See Record Document 52-4 at 27. As such, on November 21, 2014, the Defendants and the Boudreauxs entered into an agreement entitled Covenant and Partial Release with Reservation ("the Covenant"). See Record Document 52-2. Therein, the Boudreauxs acknowledged and appeared as intervenors in a new Pipeline Servitude and Right of Way Grant dated November 20, 2014, between Axiall, LLC (vendor) and Eagle (vendee) across the disputed strip of land, which is attached to the Covenant as Exhibit 1. See id. The Boudreauxs also recognized the validity of certain servitudes (a 1946 Servitude governing the 10-inch brine pipeline and a 1965 Servitude governing the 16-inch brine pipeline referred to collectively in the Covenant as "Prior Servitudes") and provided that the Prior Servitudes would continue to burden the property. See id.[4] The Boudreauxs also agreed that Defendants could install the replacement pipeline. See id. In exchange, the Boudreauxs received $450,000.00 in consideration. See id.

---

Court had not previously dismissed this claim, it would do so now under the terms of the Covenant.

[4] "Prior Servitudes" is defined by the Covenant to include the September 3, 1946, servitude between The Union Sulphur Company, Inc., and Southern Alkali Corporation, and the December 22, 1965, servitude between Allied Chemical Corporation and Pittsburgh Plate Glass Company. See Record Document 52-2 at 1.

3

The Defendants move to dismiss several of Boudreaux's claims arguing that in addition to his agreement to the terms of the Covenant listed above, Boudreaux also agreed to release certain claims asserted in his lawsuit. See Record Document 52-1 at 6. The terms of the Covenant relevant to Defendants' motion for summary judgment are as follows:

> NOW, THEREFORE, in consideration of FOUR-HUNDRED AND FIFTY THOUSAND AND NO/100 ($450,000.00) DOLLARS, paid to the Boudreauxs in conjunction with this Covenant and the Servitude Agreement and other valuable consideration, receipt and sufficiency of which is hereby acknowledged by the Boudreauxs, and of the foregoing recitals which are incorporated herein by reference, the Boudreauxs do hereby agree as follows:
>
> 1.  The Boudreauxs expressly consent and agree to cooperate fully in Eagle's work and operations on the Pipelines[5], which shall include, but is not limited to, allowing access to Eagle's officers, agents, employees, contractors and invitees to enter onto and work on the Property where the Pipelines are to be or have been installed and operated, to inspect and monitor the condition and effectiveness of any work on the Pipelines, to install, perform maintenance, repair and/or replace the Pipelines as necessary, and to manage the Property where the work occurs in a manner to meet the purposes set forth in the Servitude Agreement and the Prior Servitudes.
>
> 2.  Subject to paragraph 9 of this Covenant, the Boudreauxs agree not to initiate, allege, pursue, maintain, file and/or continue prosecution of any claims, demands, actions, lawsuits, liabilities, and/or causes of action of whatever kind or character, whether known or unknown, which they have or might claim to have against Axiall or Eagle, for any and all injuries, harm, breach of contract, trespass, damages, unjust enrichment, disgorgement of profits, penalties, costs, losses, expenses, attorneys' fees, and/or liability or other detriment, if any, whatsoever and whenever incurred or suffered, arising out of, relating to, or in connection with the work on and operation of the Pipelines contemplated and covered by and associated with the Servitude Agreement, nor to challenge the validity, terms or conditions of the Servitude Agreement or Prior Servitudes, under any circumstances, including but not limited to any action for declaratory judgment, rescission, reformation, lesion, vice(s) of consent, specific performance, cancellation, termination, and/or dissolution. It is mutually acknowledged that all references to Axiall and/or Eagle in this Covenant shall include each entity's

---

[5] "Pipelines" is defined by the Covenant to include both of the brine pipelines installed pursuant to the Prior Servitudes and the additional pipelines to be installed as contemplated and covered by the Servitude Agreement dated November 21, 2014, which is attached to the Covenant as Exhibit 1. See Record Document 52-2 at 1-2.

parents, affiliates and subsidiaries, predecessors, and assigns and their former and present agents, employees, directors, officers, members, stockholders, insurers, contractors, attorneys, and other persons acting at their direction, on their behalf or under the supervision, direction or control.

. . .

9.      Except as set forth in paragraphs 1 and 2 above, the Boudreauxs reserve their rights in the claims asserted solely for any environmental contamination alleged or to be alleged in the suit titled "*Robert Lee Boudreaux, et ux., v. Axiall Corporation, et al*" (Case No. 2014-2032 "H"), filed in the 14th Judicial District Court on May 21, 2014, which was removed to federal court and is currently pending as "*Robert Lee Boudreaux, et ux. v. Axiall Corporation, et al.*," No. 2:14-cv-02283-PM-KK, in the United States District Court, Western District of Louisiana, Lake Charles Division.[6] Notwithstanding the foregoing reservation, this Covenant is intended to confirm, ratify, and facilitate the continuation of the terms of the Servitude Agreement and Prior Servitudes, both retroactively and prospectively from the execution of this Covenant.  The Boudreauxs unconditionally relinquish the right to seek to evict Axiall or Eagle from the Property or otherwise disturb or allow to be disturbed Axiall's or Eagle's rights to the Pipelines, irrespective of any court determination affecting the Prior Servitudes, and regardless of the installation date of any of the Pipelines.

See Record Document 52-2 at 2-3.

The Defendants argue that the Covenant releases them from liability for all claims except for Boudreaux's property damage claims resulting from "environmental contamination" in the instant lawsuit.  See Record Document 52-1 at 6.  As such, Defendants seek the dismissal of all claims other than those for "environmental contamination."  See id.  Boudreaux contends that the language of the Covenant reserves his right to pursue all claims related in any way to "environmental contamination," and that he did not expressly release his right to assert any future claims that may arise after the signing of the Covenant.  See Record Document 117 at 9.

---

[6] On September 29, 2016, Case No. 2:14-cv-02283-PM-KK was remanded to the 14th Judicial District Court.  On July 20, 2018, newly added Third-Party Defendants Parsons Government Services, Inc., Gilbane Building Company, and Gilbane, Inc. removed the case again citing 28 U.S.C. § 1442(a)(1).  See Record Document 1.  Thus, this matter is the same case referenced in the Covenant.

5

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). The moving party need only point out the absence of supporting evidence of the non-moving party's case. Id. Once this burden is satisfied the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak or tenuous that it could not support a judgment in the nonmovant's favor. Id.

In cases involving contract interpretation, summary judgment is proper if the contract in question is unambiguous. See D.E.W., Inc. v. Loc. 93, Laborers' Int'l Union of N. Am., 957 F.2d 196, 199 (5th Cir. 1992). "The interpretation of an unambiguous contract is a matter of law[.]" S. Nat. Gas Co. v. Pursue Energy, 781 F.2d 1079, 1081 (5th Cir. 1986). However, where a contract is ambiguous such that it requires interpretation through extrinsic evidence, a determination of the parties' intent is a matter of fact. See id. "Thus, a district court may properly grant summary judgment when a contract is unambiguous, but may not grant summary judgment when a contract is ambiguous and the parties' intent presents a genuine issue of material fact." Id. (citations omitted).

## LAW AND ANALYSIS

**I.    Choice of Law**

The Covenant is an agreement between Axiall LLC and Eagle, each organized under Delaware law, and Boudreaux, a citizen of Louisiana.  See Record Document 52-2 at 1.  The Covenant does not contain a forum selection clause.  Thus, the Court must apply the choice of law rules of the forum state, Louisiana, to determine which state's law will govern.  See N. Am. Land Dev. Corp. v. Jeld-Wen, Inc., No. 17-1483, 2019 WL 2528867 (W.D. La. June 4, 2019).  Louisiana Civil Code article 3515 provides:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> The state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

The dispute in this instance is the interpretation of the Covenant, which is to be fulfilled in Louisiana.  There is no indication that the policies of Delaware would be impaired in any manner if its laws were not to apply.  Conversely, the immovable property impacted by the Covenant, regardless of ultimate ownership, is in Louisiana and the terms of the Covenant are to be performed in Louisiana.  Therefore, this Court will apply Louisiana law.

**II.   Analysis of the Covenant**

As noted above, the Defendants maintain that Boudreaux executed a compromise agreement (the Covenant) wherein he made a broad release of claims, subject to a limited reservation, in exchange for consideration.  See Record Document 52-1 at 15.  "A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a

dispute or an uncertainty concerning an obligation or other legal relationship." La. Civ. Code art. 3071. It is a release executed in exchange for consideration. See Singleton v. USAA, 18-15 (La. App. 5 Cir. 10/17/18), 258 So.3d 1074, 1076. "A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express." La. Civ. Code art. 3076. A valid compromise therefore requires "a meeting of the minds between the parties as to what they intended when the compromise was reached." Percle v. Purdue, No. 17-0549, 2019 WL 4915455, at *2 (W.D. La. Oct. 3, 2019) (citing Rivett v. State Farm Fire & Cas. Co., 508 So. 2d 1356, 1359 (La. 1987)).

"A compromise precludes the parties from bringing a subsequent action based upon the matter that was compromised." La. Civ. Code art. 3080. Further, it "may form the basis of a plea of res judicata." Rivett, 508 So. 2d at 1359. "While the doctrine of res judicata is ordinarily premised on a final judgment on the merits, it also applies where there is a transaction or settlement of a disputed or compromised matter that has been entered into by the parties." Dempster v. Lamorak Ins. Co., No. 20-0095, 2021 WL 310485, at *5 (E.D. La. Jan. 29, 2021) (quoting Ortega v. Dep't of Transp. & Dev., 96-1322 (La. 2/25/97), 689 So. 2d 1358, 1363). The party urging res judicata based on compromise bears the burden of proof to establish the necessary elements of a valid compromise, including the parties' intent to settle the differences asserted in the current cause of action. See Brown v. Drillers, Inc., 630 So. 2d 741, 747 (La. 1994); see also Rivett, 508 So. 2d at 1359.

A compromise is to be "interpreted in accordance with the intent of the parties" and "governed by the same general rules of statutory construction that are applicable to contracts." Jones v. Travelers Ind. Co., No. 18-946, 2018 WL 6684584, at *2 (W.D. La. Dec. 19, 2018) (quoting Trahan v. Coca Cola Bottling Co. United, Inc., 2004-0100 (La. 3/2/05), 894 So. 2d

1096, 1106). "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046.[7] "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. The words of a contract that are "susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048.

"Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. "Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include." La. Civ. Code art. 2051. Finally, "[i]t is well established that, in contract interpretation, the more specific provision controls the general." Master Craft Constr., LLC v. Pronoun, Inc., 2017-569, (La. App. 3 Cir. 12/20/17), 258 So.3d 802, 807; Corbello v. Iowa Prod., 2002-0826 (La. 2/25/03), 850 So. 2d 686, 704 (La. 2/25/03) (as clarified on reh'g 06/20/03).

"Louisiana Courts have crafted a jurisprudential exception to the extrinsic evidence rule for compromise agreements." Maggio v. Parker, 2017-1112 (La. 6/27/18), 250 So. 3d 874, 879.

---

[7] The Louisiana Supreme Court has explained that the word "further" in this article indicates that a court's determination that language contained in a contract is clear and explicit inherently involves an interpretive process. See Brown, 630 So. 2d at 748. It is for this reason Louisiana Civil Code article 2046 "emphasizes that the process involves no further interpretation, as to opposed to no interpretation at all." Id. (citation omitted).

9

"When a dispute arises as to the scope of a compromise agreement, 'extrinsic evidence can be considered to determine exactly what differences the parties intended to settle.'" Id. (quoting Brown, 630 So. 2d at 749). "Louisiana courts have limited the application of the extrinsic evidence exception to cases in which substantiating evidence is presented establishing either (1) that the releaser was mistaken as to what he or she was signing, even though fraud was not present; or (2) that the releaser did not fully understand the nature of the rights being released or that the releaser did not intend to release certain aspects of his or her claim." Id. "When the factual circumstances surrounding the execution of the release instrument do not fall within either of the above categories, Louisiana courts have applied the general rule of construction in La. Civ. Code art. 2046 and have not hesitated to confine their analysis to the four corners of the instrument." Id. at 878-879.

Defendants maintain that the Court need only examine the four corners of the Covenant to determine that summary judgment is appropriate. See Record Document 52-1 at 13. Defendants note that Paragraph 2 states, in relevant part:

> Subject to paragraph 9 of this Covenant, the Boudreauxs agree not to initiate, allege, pursue, maintain, file and/or continue prosecution of any claims, demands, actions, lawsuits, liabilities, and/or causes of action of whatever kind or character, whether known or unknown, which they have or might claim to have against Axiall or Eagle, for any and all injuries, harm, **breach of contract**, **trespass**, damages, unjust enrichment, disgorgement of profits, penalties, costs, losses, expenses, **attorneys' fees**, **and/or liability or other detriment, if any, whatsoever and whenever incurred or suffered, arising out of, relating to, or in connection with the work on and operation of the Pipelines contemplated and covered by and associated with the Servitude Agreement [8], nor to challenge the validity, terms or conditions of the Servitude Agreement or Prior Servitudes, under any circumstances**….

---

[8] The Court has reviewed the Servitude Agreement and notes that it discusses the pipelines covered by Prior Servitudes and new replacement pipeline. Accordingly, the Court finds that all three Pipelines (as defined by the Covenant) were "contemplated and covered by and associated with the Servitude Agreement" as noted in Paragraph 2.

See Record Document 52-1 at 15 (emphasis noted in Defendants' brief).  Defendants argue that this paragraph provides a broad unambiguous release of Plaintiffs' claims, reserving only the right to recover for claims of alleged environmental contamination as set forth in Paragraph 9, which Defendants maintain is a claim based in tort.  See id. at 15-16.  Defendants also note that the Covenant was negotiated with Plaintiffs' counsel in an arms-length transaction devoid of any allegations of fraud, vices of consent, or lack of capacity.  See id. at 15.  As such, Defendants assert that the Covenant must be enforced as written, reserving only Plaintiff's claims for environmental contamination, a tortious allegation based on the leaks from the pipelines.  See id. at 16.  Defendants therefore seek the dismissal of all other claims, including breach of contract, breach of the servitude agreements, trespass, attorney's fees, LUTPA, and all claims intended to cancel, terminate, or dissolve the prior servitudes.  See id. at 17-22.

Plaintiff disagrees, arguing that Paragraph 9 of the Covenant reserves his right to pursue all of the claims in this lawsuit to the extent that they are related in any way to environmental contamination.  See Record Document 117 at 9.  Throughout his brief, the Plaintiff states that "Paragraph 9 of the Covenant broadly reserves the plaintiffs' right to pursue all claims for 'environmental contamination alleged or to be alleged in [this lawsuit].'"  See id. at 11-12.  Thus, Plaintiff maintains that a claim for environmental contamination may be expressed as a tort, breach of contract, breach of servitude, trespass, a claim for attorney's fees, and a claim under LUTPA.  See id. at 12.  Indeed, under Plaintiff's proposed interpretation of the clause, none of his claims would have been released by the Covenant agreement.  See id. at 14.

Despite the parties' adverse positions and related arguments in their respective briefs, the Court sees no substantiating evidence that Boudreaux was mistaken as to what he was signing, did not understand his rights being released, or did not intend to release certain aspects of his

11

claims.  See Smith v. Amedisys Inc. 298 F.3d 434, 445 (5th Cir. 2002) (citing Brown, 630 So. 2d at 749).  Noting the lack of extrinsic evidence, the Court will proceed in applying the general rules of contract interpretation and will interpret the Covenant from the four-corners of the document.  See id.; Maggio, 250 So. 3d at 878-879.

### A.     Environmental Contamination

The Court notes that it appears to be undisputed that the Plaintiff reserved his claim for environmental contamination as a tort claim.  This is consistent with Louisiana law, which provides that a claim for environmental contamination that causes damage to immoveable property is a delictual or tortious act.  See Hogg v. Chevron USA, Inc., 2009-2632 (La. 7/6/10), 45 So. 3d 991, 1001 (contamination of soil is a tortious act).

The dispute between the parties arises based on the interpretation of Paragraph 9.  The Court notes that the entirety of the phrase in question from Paragraph 9, states, in relevant part: "Except as set forth in paragraphs 1 and 2 above, the Boudreauxs reserve their rights in the claims asserted **solely** for any environmental contamination alleged or to be alleged in the suit[.]"  See Record Document 52-2 at 3 (emphasis added).  The common definition of "solely" is "only; not involving anyone or anything else."  See Cambridge University Press Dictionary (https://dictionary.cambridge.org).  The parties disagree as to what qualifies as a claim for environmental contamination reserved by the Plaintiff in Paragraph 9.  Defendants take a narrow approach, arguing that the Plaintiff only reserved environmental contamination claims based in tort, all others being waived by Paragraph 2.  See Record Document 52-1 at 16.  As noted above, the Plaintiff maintains that all of his claims in this lawsuit may be considered environmental contamination claims.  See Record Document 117 at 14.

12

The Court interprets the clause contained in Paragraph 9 as reserving only Plaintiff's right to pursue claims asserted for environmental contamination in the conventional sense of the phrase (i.e. damage to immoveable property), not as an avenue to pursue claims that are merely tangentially related. The term "solely" is the operative term of the phrase and must be given its ordinary and plain meaning. If, as Boudreaux suggests, all of his claims were reserved by Paragraph 9, then the term "solely" would have to be ignored. This is inconsistent with the principals of contract interpretation, which require the Court to give words their generally prevailing meaning. See La. Civ. Code art. 2047. Based on this interpretation, the Court readily finds that Plaintiff released his claims for trespass, attorney's fees, and LUTPA violations.

The more nuanced question arises in regard to Plaintiff's claims for environmental contamination based on a breach of contract. The Court agrees with the Plaintiff that in certain circumstances environmental contamination may be asserted as a claim for breach of contract. Indeed, even the Defendants concede in their reply brief that environmental contamination may form the basis of a claim for breach of contract. See Record Document 143 at 3. However, after carefully reviewing the Covenant, and Paragraphs 2 and 9 in particular, the Court finds that Plaintiff has waived his claim for breach of contract. The plain language of paragraph 2 indicates that Boudreaux expressly released his claim for breach of contract. If Plaintiff did not intend to release his breach of contract claim, he should have specifically reserved his breach of contract claim in Paragraph 9. The phrase "solely for any environmental contamination" does not clearly reserve a claim for breach of contract when such claims were expressly waived in another clause.

B.     Future Claims

Boudreaux maintains that, assuming he released certain claims by signing the Covenant, he only released those claims that were actually in existence at the time the Covenant was executed. See Record Document 117 at 14. Boudreaux argues that none of the language found in Paragraph 2 of the Covenant expressly released future claims for later acquired causes of action. See id. at 15. As such, Boudreaux contends that he did not release any "future claims" based on acts, omissions, or facts and circumstances that occurred after the execution of the Covenant. See id. at 14.

Defendants counter that Louisiana law provides that, in general, a person "may settle any difference they may have in the present or in the future that is the subject of a lawsuit or that could result in litigation." Record Document 143 at 4 (emphasis omitted) (quoting Daigle v. Clemco Indus. 613 So. 2d 619, 622 (La. 1993)). Defendants maintain that Boudreaux compromised all future claims based on the language of Paragraph 2, which Defendants contend released all claims "whether known or unknown, which they have or might have…whatsoever and whenever incurred or suffered…." See id. at 5. Defendants argue that inclusion of the phrase "whatsoever and whenever" provides a broad general release of Boudreaux's claims, including any future claims, related to the operation of the pipelines and the Prior Servitudes. See id. at 5-6.

"A compromise does not affect rights subsequently acquired by a party, unless those rights are expressly included in the agreement." La. Civ. Code art. 3078. "[R]eleases of future actions are narrowly construed to assure that the parties fully understand the rights released and the resulting consequences. As a result, if the release instrument leaves any doubt as to whether a particular future action is covered by the compromise, it should be construed not to cover such

future action." Young v. Equifax Credit Info. Servs., Inc., 294 F.3d 631, 637 (5th Cir. 2002) (quoting Brown, 630 So. 2d at 753).

The Court once again turns to Paragraph 2, which states in relevant part:

Subject to paragraph 9 of this Covenant, the Boudreauxs agree not to initiate, allege, pursue, maintain, file and/or continue of any claims, demands, actions, lawsuits, liabilities, and/or causes of action of whatever kind or character, **whether known or unknown, which they have or might claim to have** against Axiall or Eagle, for any and all injuries, harm, breach of contract, trespass, damages, unjust enrichment, disgorgement of profits, penalties, costs, losses, expenses, attorneys' fees, and/or liability or other detriment, if any, **whatsoever and whenever incurred or suffered**, arising out of, relating to, or in connection with the work on and operation of the Pipelines contemplated and covered by and associated with the Servitude Agreement, nor to challenge the validity, terms or conditions of the Servitude Agreement or Prior Servitudes, under any circumstances, including but not limited to any action for declaratory judgment, recession, reformation, lesion, vice(s) of consent, specific performance, cancellation, termination, and/or dissolution.

See Record Document 52-2 at 2 (emphasis added).

Applying the principles of Louisiana Code article 3078, the Court finds that Paragraph 2 is sufficient to release Plaintiff's future claims that were specifically enumerated in Paragraph 2, including breach of contract and trespass. The phrases "whether known or unknown, which they have or might have" and "whatsoever and whenever incurred or suffered" are sufficient to preclude future claims because the phrases refer to events that could arise in the future. However, the Court notes that the waiver would only apply to the claims specifically enumerated in Paragraph 2. General terms such as "any claims, demands, actions, or lawsuits" are insufficient to preclude all future claims not expressly excluded by Paragraph 2.

In connection with the issue of future claims, Defendants also argue that Plaintiff has released his right to terminate, cancel, or dissolve the servitudes affecting the Brimstone Strip, and requests that the Court dismiss these claims. See Record Document 52-1 at 17. The Court notes that Plaintiff's operative complaint does not contain a request to cancel, terminate, or

15

dissolve the Prior Servitudes.  <u>See</u> Record Document 1-15.  The Court cannot provide an advisory opinion concerning matters outside of the Plaintiff's complaint.

## CONCLUSION

Based on the foregoing reasons, Defendants' Motion for Partial Summary Judgment Based on Compromise (Record Document 52) is hereby **GRANTED**.  An order consistent with this ruling will issue forthwith.

**THUS DONE AND SIGNED**, this 30th day of March, 2022.

*/s/ Donald E. Walter*
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE