UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

---

ROBERT LEE BOUDREAUX                CIVIL ACTION NO. 18-0956

VERSUS                              JUDGE DONALD E. WALTER

AXIALL CORP., ET AL.                MAGISTRATE JUDGE KAY

---

**MEMORANDUM RULING**

Before the Court is a Motion for Partial Summary Judgment on Assumption of Liabilities and Obligations filed by the Plaintiff, Robert Lee Boudreaux ("Boudreaux"). See Record Document 132. The Defendants, Eagle US 2 LLC ("Eagle"), Axiall Corporation, and Axiall, LLC, oppose the motion. See Record Document 152.[1] Also before the Court is a Motion for Partial Summary Judgment Seeking Dismissal of Plaintiff's Successor Liability Claims filed by the Defendants. See Record Document 237. The Plaintiff opposes the motion. See Record Document 259. Although the motions are not labeled as cross-motions, the substantive arguments are the same. Accordingly, the Court has considered the motions concurrently.

For the reasons assigned herein, Plaintiff's motion (Record Document 132) is hereby **GRANTED** and Defendants' motion (Record Document 237) is hereby **DENIED**.

---

[1] Third-Party Defendants Gilbane Building Company, Gilbane Inc., Parsons Government Services, Inc., National Union Fire Insurance Company of Pittsburg, PA, Granite State Insurance Company, and Lexington Insurance Company filed an Opposition to Plaintiff's motion requesting that the Court defer consideration of this matter pursuant to Federal Rule of Civil Procedure 56(d). See Record Document 153. The Court finds that the Third-Party Defendants have had ample time to obtain information necessary to file a response to this motion. Additionally, the Court's ruling is based upon the interpretation of documents that were attached to Plaintiff's original motion. This information should have been sufficient to provide the Third-Party Defendants the opportunity to adequately respond. As such, a deferral of consideration of this motion is not warranted.

## BACKGROUND INFORMATION

Robert Boudreaux filed suit against the Defendants for damages to his land allegedly caused by brine leaking from two pipelines. See Record Document 1-15 at ¶ 5. The now defunct pipelines are currently owned by Eagle, a wholly owned subsidiary of Axiall Corporation, and were once used to transport brine from the Sulphur salt dome mines to Axiall's chemical plant in Westlake, Louisiana. See id. at ¶¶ 6-7. On May 21, 2014, Boudreaux filed suit against the Defendants alleging that leaks from the two pipelines severely contaminated his land. See id.

Boudreaux also alleges that Eagle acquired ownership of the pipelines from its corporate predecessor, PPG Industries, Inc. ("PPG"), in January of 2013. See id. at ¶ 12. Boudreaux contends that PPG transferred all of its environmental remediation liabilities to Axiall and/or Eagle. See id. at ¶¶ 8-14. Boudreaux's Motion for Partial Summary Judgment on Assumption of Liabilities and Obligations seeks a ruling by the Court declaring as a matter of law that Eagle expressly assumed all liabilities and obligations arising out of PPG's pre-January 2013 brine pipeline operations. See Record Document 132. Conversely, Defendants' Motion for Partial Summary Judgment Seeking Dismissal of Plaintiff's Successor Liability Claims seeks a judgment dismissing all claims premised on successor liability. See Record Document 237.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. See id., at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion"). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor. See Little, 37 F.3d at 1075. A grant of summary judgment is warranted when the record as a whole "could not lead a rational trier of fact to find for the non-moving party." Matsushita, 475 U.S. at 587.

In cases involving contract interpretation, summary judgment is proper if the contract in question is unambiguous. See D.E.W., Inc. v. Loc. 93, Laborers' Int'l Union of N. Am., 957

F.2d 196, 199 (5th Cir. 1992). "The interpretation of an unambiguous contract is a matter of law[.]" S. Natural Gas Co. v. Pursue Energy, 781 F.2d 1079, 1081 (5th Cir. 1986). However, where a contract is ambiguous such that it requires interpretation through extrinsic evidence, a determination of the parties' intent is a matter of fact. See id. "Thus, a district court may properly grant summary judgment when a contract is unambiguous, but may not grant summary judgment when a contract is ambiguous and the parties' intent presents a genuine issue of material fact." Id. (citations omitted).

## LAW AND ANALYSIS

**I.      Choice of Law**

Because this case implicates the law of several jurisdictions, the Court must first determine the correct law to apply. A federal court sitting in diversity applies the law of the forum state in resolving conflict-of-laws issues.[2] See Energy Coal v. CITGO Petroleum Corp., 836 F.3d 457, 459 (5th Cir. 2016). Louisiana Civil Code article 3540 states that, except for issues of form and capacity, a choice-of-law provision contained in a contract will, in most circumstances, conclusively determine the law to be applied to a contractual dispute. See La. Civ. Code art. 3540. The only exception to the application of a forum selection provision is when the chosen jurisdiction's law "contravenes the public policy of the state whose law would otherwise be applicable under Article 3537," that is, the state whose law would be applicable had there been no choice-of-law provision. La. Civ. Code art. 3540, cmt. (f).

There are two documents at issue in this case that the Plaintiff contends transferred certain liabilities from PPG to Defendants. The documents in question – "Agreement and Plan of Merger" and "Separation Agreement" – each contain a forum selection clause which state,

---

[2] This matter was removed from state court under the federal officer removal statute, 28 U.S.C. § 1442(a).

respectively, that the documents are to be "governed by and construed and interpreted in accordance with the Laws of the State of Delaware…." Record Document 133-2 at 65 (Ex. G at § 7.3); Record Document 133-1 at 100 (Ex. F at § 11.10). In this instance, there is nothing to suggest that the laws of any other jurisdiction besides Delaware would apply to the documents. Accordingly, the Court will proceed with applying Delaware law.

**II.     The Merger and its Impact on Liabilities**

The pipelines at issue in this litigation and the Lake Charles South Plant were previously owned and operated for decades by PPG. See Record Document 132-4 ("Barker Dep. Vol. I.") at 79. In January 2013, PPG transferred its commodity chemicals business, including the Lake Charles South Plant and the subject pipelines, to Axiall. See id. at 80. This was accomplished through the use of two documents: (1) a "Separation Agreement" dated July 18, 2012, between PPG and Eagle Spinco, Incorporated ("Eagle Spinco") and (2) an "Agreement and Plan of Merger" also dated July 18, 2012, by and among Burgundy [PPG], Eagle Spinco, Grizzly [Georgia Gulf Corporation] and Grizzly Acquisition Sub, Incorporated ("Merger Sub").[3] See Record Document 133-1 (Ex. F); Record Document 133-2 (Ex. G).  Eagle Spinco is the corporate parent of Eagle. See Record Document 237-2 at ¶ 5. PPG transferred ownership of the pipelines at issue in this litigation to Eagle on January 22, 2013, via an Act of Contribution and Assignment. See Record Document 132-12 (Ex. J-1).

As noted above, the parties dispute the resulting effect of this transaction on the liabilities created by the leaking pipelines before the transfer of the ownership of the pipelines occurred. Defendants have raised several defensive theories, while Plaintiff maintains that the Defendants

---

[3] Throughout both documents PPG is referred to as "Burgundy" and Georgia Gulf Corporation is referred to as "Grizzly."  For ease of reference, the Court will also refer to the corporate name.

5

expressly assumed PPG's liabilities in the merger documents.[4] The Court will address these arguments in turn.

### A. Successor Liability

As a general rule, "when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability." Golden State Bottling Co. v. N.L.R.B., 414 U.S. 168, 182 n. 5, 94 S.Ct. 414 (1973) (citations omitted). The law in Delaware is similar, in that the purchaser may be liable for the obligations of the selling corporation in four situations: (1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered into fraudulently. See Elmer v. Tenneco Resins, Inc., 698 F. Supp. 535, 540 (D. Del. Nov. 1, 1988).

### i. Effect of PPG's Continued Existence

Defendants argue that successor liability cannot be imposed in this case because PPG still exists as a corporation, but was not named by Plaintiff as a party in this litigation. See Record Document 237-1 at 11. Indeed, Defendants contend that the continued existence of PPG as an entity acts as a bar to successor liability claims in Delaware and virtually every other jurisdiction. See id. This defense is often cited in cases involving products liability claims where the original manufacturer of a product is purchased by a parent company, and an injured plaintiff attempts to hold that new parent company liable for his injury. For example, in Buck v. Endo

---

[4] Defendants argue that Plaintiff failed to adequately plead sufficient facts to establish this exception. See Record Document 237 at 22. The Court disagrees, and finds Plaintiff's Complaint sufficient. See Record Document 1-15 at ¶¶ 8-14.

Pharmaceuticals, Inc., No. 18-837, 2019 WL 1900475 (E.D. Penn. Apr. 29, 2019), which was cited by Defendants, Endo Pharmaceuticals ("Endo") purchased all of the stock of the manufacturer of a medical device, making the manufacturer a wholly-owned subsidiary of Endo. See id. at * 1. The plaintiff sued both Endo and the subsidiary manufacturer of the product, arguing that Endo could be held liable under one of the exceptions to the general rule against successor liability. See id. at *3. The court in that case held that successor liability could not be imposed because the original manufacturer of the product still existed as the wholly-owned subsidiary of Endo, meaning that Endo could not be the successor. See id. at *4. Of note, and distinctive from this case, the plaintiff did not allege sufficient facts to infer that Endo had expressly or impliedly assumed the liabilities of the manufacturer. See id.

The Court has examined the numerous cases cited by the Defendants and notes that the majority of the cases do not involve attempts to establish successor liability based on an express assumption of obligations. If the Plaintiff were attempting to establish successor liability based on one of the other exceptions to the general rule regarding successor liability the Court would agree with the Defendants. However, the Plaintiff argues that the Defendants expressly assumed liability under the terms of the Separation Agreement and Agreement and Plan of Merger. Despite the fact that PPG still exists as a corporation, if Defendants expressly agreed to assume PPG's pre-2013 liabilities, that provision would control. See United States v. Chrysler Corp., No. 88-341, 1990 WL 127160 (D. Del. Aug. 28, 1990) (express assumption of liability found based on language in separation agreement despite selling company's continued existence).

    ii.  **Structure of the Merger**

Defendants further argue that the merger was accomplished through the implementation of a reverse triangular merger, which is "specifically designed to preclude the imposition of

successor liability." See Record Document 237 at 14-15. Plaintiff argues that the use of this type of merger does not prohibit the purchaser from expressly assuming specific liabilities and obligations, as Plaintiff maintains happened in this case. See Record Document 259 at 22.

The primary purpose of a reverse triangular merger is to consolidate two firms indirectly. See Verizon Comm. Inc., v. Nat'l Union Fire Ins. Co., 2021 WL 710816, at *2, n. 21 (D. Super. Ct. Feb. 23, 2021). A reverse triangular merger proceeds in the following steps: (1) the acquiring company creates a wholly-owned subsidiary; (2) as the sole stockholder of the subsidiary, the acquiring company votes in favor of the merger with the target company; (3) the result is that the subsidiary is merged into the target company, with the target company surviving the transaction. See Balotti & Finkelsteins, *Delaware Law of Corporations & Business Organizations*, Vol. 1 §§ 9.6-9.8. The reverse triangular merger has become a preferred method of acquisition for a wide range of corporate transactions. See Lewis v. Ward, 2003 WL 22461894, at *4, n. 18. (D. Ch. Oct. 29, 2003). One reason for its popularity is that the stockholders of the acquiring company do not have a right to vote on the merger. See id. Another is that because the merger is accomplished by the acquiring company's creation of a subsidiary to effect the merger, the acquiring company (i.e. parent company) is shielded from the liabilities and obligations of the target company. See id.

In this case, Georgia Gulf[5] formed a subsidiary, Grizzly Acquisition Sub, which then merged with and into Eagle Spinco, which continued as the surviving company. See Record Document 133-1 at 7 (Ex. F recitals). Eagle Spinco was created as a wholly-owned subsidiary of PPG to facilitate the separation and transfer of PPG's chlor-alkali and chemical business. See Record Document 133-2 at 6 (Ex. G. recitals). Applying the reverse triangular merger concepts

---

[5] Georgia Gulf Corporation has since changed its name to Axiall Corporation. See Record Document 237-4 at 7-9.

to this case, Axiall Corporation (formerly Georgia Gulf), is shielded from the liabilities and obligations of Eagle Spinco because it formed and used Grizzly Acquisition Sub to effectuate the merger. However, Eagle Spinco, the surviving company, would remain liable for any liabilities or obligations that were transferred as part of the merger. The use of a reverse triangular merger would not shield Eagle Spinco from liabilities it specifically and expressly assumed as part of the merger.

### iii. Indemnity Provisions

Defendants also argue that the Separation Agreement contains certain indemnity provisions that "provide for indemnity between the parties, not for assumption of PPG's purported liability to strangers to the contracts." See Record Document 237 at 15. Defendants note that Article V of the Separation Agreement provides for mutual indemnification, with Spinco agreeing to indemnify PPG for "Spinco Liabilities" and PPG agreeing to indemnify Spinco for "Excluded Liabilities." See id. at 16; Record Document 133-2 at 46-49 (Ex. G. at Article V). Defendants note that Article V contains a notice provision that requires the members of the Separation Agreement to provide prompt written notice of a claim asserted by a third-party, which is a prerequisite to seeking indemnity for a third-party claim. See Record Document 237 at 17. Defendants contend that the provisions of Article V have not been triggered because Plaintiff chose not to file a claim against PPG. See id.

The Court has examined the cited provisions of Article V of the Separation Agreement and finds them unhelpful to the question at hand. The indemnification provisions are merely an agreement between the parties (PPG, Spinco, and Grizzly) to indemnify and defend the others for certain liabilities and third-party claims that may arise after the transfer was completed. As such,

the provisions are not particularly relevant to the question of whether Spinco expressly assumed PPG's liabilities.

### iv. "No Third Party" Clause

Defendants also cite to clauses within the Separation Agreement and the Merger Agreement, arguing that the clauses preclude the Plaintiff from asserting successor liability claims. See Record Document 237 at 19. Specifically, Defendants cite Section 7.8 of the Separation Agreement entitled "Parties in Interest," which states in relevant part: "This agreement is not made for the benefit of any Person not a Party hereto, and no Person other than the Parties hereto … will acquire or have any benefit, right, remedy or claim under or by reason of this Agreement." See Record Document 133-2 at 67 (Ex. G at § 7.8). Defendants also cite to Section 11.7 of the Merger Agreement entitled "No Third Party Beneficiaries," which states in relevant part: "Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person … any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, and no Person (other than so specified) shall be deemed a third party beneficiary under or by reason of this Agreement." See Record Document 133-1 at 99 (Ex. F at § 11.7).

Defendants argue that the PPG agreements expressly disclaim any benefit to third parties, allowing only for indemnity between the parties thereto. See Record Document 237 at 21. Plaintiff counters that the "boilerplate" clauses cited by Defendants cannot be given effect because more specific provisions of the Separation Agreement indicate that Eagle expressly assumed certain liabilities and agreed to be liable to third parties. See Record Document 259 at 24.

The Court does not find the clauses cited by the Defendants to be dispositive under the facts of this case. In general, the question of whether a party may be considered a third-party beneficiary under a contract is relevant on the issue of whether that party has standing to bring a claim to enforce the contract. See Insituform of N. Am., Inc. v. Chandler, 534 A.2d 257, 268 (Del. Ch. Oct. 20, 1987). The Plaintiff in this instance has not asserted a claim to enforce the terms of the Separation Agreement. Rather, the Plaintiff has asked the Court to determine whether the language of the Separation Agreement indicates that the alleged harm in this case would be of the type included in the liabilities assumed by Eagle under the terms of the Separation Agreement to properly calculate damages.

### B. Whether Eagle Assumed Liabilities Related to the Pipelines

The Court now turns to the language of the Separation Agreement, which Plaintiff maintains amounts to an express assumption of liability. As noted above, Plaintiff argues that under the plain language of the merger documents Eagle agreed to assume all liabilities and obligations arising out of PPG's pre-January 2013 operations associated with the brine pipelines. See Record Document 132-1 at 14. Plaintiff notes that Section 2.1 of the Separation Agreement provides that PPG will assign and transfer all of its "right, title, and interest in and to" certain assets – defined as the "Spinco Assets" – to a Spinco Entity, and that "such Spinco Entity will assume, perform, discharge and fulfill when due and, to the extent applicable, comply with all of the Spinco Liabilities." Simply stated, Plaintiff contends, "the Spinco Entity (here, Eagle) agreed to expressly assume all of the Spinco Liabilities in return for its acquisition of Spinco Assets."

Section 2.1 of the Separation Agreement is entitled "Transfer of Spinco Assets; Assumption of Liabilities," and provides as follows:

> (a) Burgundy [PPG] will assign, transfer, convey and deliver … to Spinco the equity interest in the Spinco Entities that are to be held directly by Spinco… and Spinco will accept from Burgundy [PPG] all of Burgundy's [PPG's] … right, title, and interest in and to all Spinco Assets; and
>
> (b) Burgundy [PPG] will Convey (or will cause any applicable Subsidiary to Convey) to a Spinco Entity other than Spinco, and such Spinco Entity will assume, perform, discharge, and fulfill when due and, to the extent applicable, comply with all of the Spinco Liabilities, in accordance with their respective terms.

See Record Document 133-2 at 20-21 (Ex. G at § 2.1).

Plaintiff argues that the brine pipelines and related servitude agreements at issue in this litigation are "Spinco Assets." See Record Document 132-1 at 14. In support, Plaintiff cites to Section 2.4 of the Separation Agreement. Therein, "Spinco Assets" is defined in relevant part as "all of Burgundy's [PPG's] … rights, title and interest in and to the following Assets except as otherwise set forth…." See Record Document 133-2 at 21 (Ex. G. at § 2.4(a)). Section 2.4(a)(iv) further defines Spinco Assets to include "all Contracts that are related primarily to the Eagle Business…." See Record Document 133-2 at 22 (Ex. G at § 2.4(a)(iv)).[6] Based on this section, Plaintiff contends that the 1946 and 1965 servitude agreements, upon which the pipelines in this litigation were built, both relate to "Eagle Business" and constitute "Spinco Assets" and "Spinco Contracts" within the meaning of the Separation Agreement. See Record Document 132-1 at 15.

In addition, Plaintiff notes that Section 2.4 of the Separation Agreement also defines "Spinco Assets" to include "all … tangible personal property that are … used or held for use primarily in the Eagle Business, including those listed or described in Schedule 2.4(a)(xiv)." Id.

---

[6] In further support, Plaintiff notes that on January 22, 2013, PPG and Eagle effectuated an Act of Contribution and Assignment, which conveyed PPG's entire right, title, and interest in the two servitude agreements to Eagle. See Record Document 132-1 at 15; Record Document 132-12 (Ex. J-1 at 1, 22).

Plaintiff notes that Schedule 2.4(a)(xiv) lists the brine pipelines and related equipment as personal property that would be transferred from PPG to Eagle. See id.; Record Document 133-3 (Ex. J-2).[7] As such, Plaintiff argues that the parties to the Separation Agreement clearly recognized the pipelines as personal property used in "Eagle Business," which made them "Spinco Assets." See Record Document 132-1 at 15.

Further, Plaintiff notes that Section 2.4(a)(xv) of the Separation Agreement defines "Spinco Assets" to mean "Burgundy's [PPG's] fee and/or leasehold interests, as applicable, in and to the Starks and Sulphur Mines Salt Dome Facilities in Calcasieu Parish, Louisiana which service the Eagle Business at the Lake Charles site (including any and all personal property, pipelines and other equipment owned by Burgundy [PPG] in connection therewith." See id. at 16 (quoting Record Document 133-2 at 24 (Ex. G at § 2.4(a)(xv)). Based on this statement, Plaintiff contends that this would unquestionably include the two brine pipelines running from the Sulphur Salt Mines to the Lake Charles South plant. See id. Plaintiff also points to the deposition testimony of Eagle's representative indicating that the brine pipelines were included in the assets acquired from PPG in January 2013. See id. (citing Record Document 132-2 (Baker Dep. Vol. I at 79-80)).

Plaintiff also argues that the plain language of the Separation Agreement indicates that Eagle expressly assumed all liabilities and obligations arising out of the brine pipelines and their associated servitude agreements. See id. First, Plaintiff notes that Section 1.43 defines "Liabilities" broadly as: "all debts, liabilities … and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, secured or not

---

[7] Plaintiff notes specific items on Schedule 2.4(a)(xiv), including: (1) 10148 – Brine Line to Plant – Sulphur, (2) 10281 – Brine Transportation & Storage, (3) 10620 – Brine Transportation, (4) 10621 – Brine Instrumentation, and (5) 12043 – Brine Pipeline System Repairs. See Record Document 133-3 (Ex. J-2).

accrued, known or unknown, due or to become due, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability)...." Id. (quoting Record Document 133-2 at 13 (Ex. G at § 1.43)). Next, Plaintiff contends Eagle agreed to assume certain "Spinco Liabilities" under the following subsections of Section 2.5(a):

> (i) all Liabilities to the extent relating primarily to the Spinco Assets or the Eagle Business;
> …
> (iv) all Liabilities under the Spinco Contracts…;
> …
> (ix) all Liabilities relating primarily to the Eagle Business or any Spinco Assets to the extent that the same constitutes a past, current or future tort, breach of Contract or violation of, or non-compliance with, any Law…;
> …
> (xi) all Liabilities relating to any Action[8] related primarily to Eagle Business;
> …
> (xiv)(A) all Liabilities, known or unknown for Environmental Conditions relating primarily to activities or operations at any of the Spinco Active Sites … or any violation of Environmental Law arising out of the Eagle Business at any of the Spinco Active Sites …; and (B) all Liabilities for Environmental Conditions at any third-party site relating primarily to Hazardous Materials generated by the Spinco Active Sites. [9]

Id. at 18-19 (quoting Record Document 133-2 at 25-27 (Ex. G at §§ 2.5(a)(i), (iv), (ix), (xi) & (xiv)). Based on Plaintiff's contention that Eagle expressly assumed all liabilities and obligations concerning the brine pipelines and associated servitude agreements, Plaintiff argues

---

[8] "Action" is defined as "any demand, charge, claim, action, suit … litigation or investigation, or proceeding of any nature whether administrative, civil, criminal, regulatory or otherwise …." See Record Document 133-2 at 8 (Ex. G at § 1.3).

[9] Defendants also cite to Section 2.5(a)(xiv), which Defendants argue limits the Environmental Conditions to be considered "Spinco Liabilities" as those found at, on, or under the "Spinco Active Sites." See Record Document 237 at 26. The Court finds that this clause does not limit liability solely to Environmental Conditions occurring "at, on, or under" Spinco Active Sites. The clause also includes the phrases "relating primarily to activities or operations" and "or any violation of Environmental Law arising out of the Eagle Business at any of the Spinco Active Sites…." See Record Document 133-2 at 27 (Ex. G. at 2.4(a)(xiv)) (emphasis added). This would include the pipelines that function to support the Lake Charles site.

that the assumption included any contamination and damage caused by leaks that took place on PPG's watch before 2013.  See id. at 19.

Defendants counter that a complete reading of Section 2.5(a) indicates "'Spinco Liabilities' means … the following Liabilities except as otherwise set forth below and in each case subject to Section 2.5(b)."  See Record Document 237-1 at 22 (quoting Record Document 133-2 at 25 (Ex. G at § 2.5(a)) (emphasis added).  Defendants also note that the opening sentence of Section 2.5(b) states:  "Notwithstanding the foregoing clause (a), the Spinco Liabilities will not in any event include any of the following Liabilities (the "Excluded Liabilities")."  Id. (quoting Record Document 133-2 at 28 (Ex. G at § 2.5(b)).

Defendants maintain that certain "Environmental Conditions" arising from PPG's operations are specifically excluded under the Separation Agreement.  See id. at 23.  First, Defendants note that the Separation Agreement defines "Environmental Conditions" as "[t]he presence in the environment, including the land surface or subsurface strata, groundwater, sediment, surface water or indoor and ambient air, of any Hazardous Materials."  Id. (quoting Record Document 133-2 at 11 (Ex. G at § 1.26)).  Next, Defendants note that the Separation Agreement provides that certain "Environmental Conditions" arising from PPG's operations outside of the Lake Charles South Facility are considered "excluded Environmental Liabilities."  See id.  Section 2.5(b)(iii) defines "Excluded Environmental Liabilities" as:

> all Liabilities relating to, arising out of, or resulting from any … Non-Spinco Business, including (A) all Liabilities relating to, arising out of, or resulting from any Environmental Conditions or any violation of Environmental Law at any such locations, and (B) all Liabilities relating to, arising out of or resulting from any Environmental Conditions at any third-party site arising from, related to or resulting from Hazardous Materials from … Non-Spinco Business or Excluded Spinco Sites…."

15

Record Document 133-2 at 28 (Ex. G. at § 2.5(b)(iii)).  Defendants argue Plaintiff's property is unquestionably a "third-party site" such that if the "Environmental Conditions" arise from, relate to or result from Non-Spinco Business, then those liabilities would be Excluded Environmental Liabilities under Section 2.5(b)(iii).  See Record Document 237 at 24.

Defendants note that the Separation Agreement defines the term "Non-Spinco Business" in relevant part as: "all businesses and operations … conducted prior to the Business Transfer Time by Burgundy [PPG] … that are not included in the Eagle Business."  Id. (quoting Record Document 133-2 at 14 (Ex. G at § 1.48)).  The Separation Agreement defines "Eagle Business" as follows:

> "Eagle Business" means chlor-alkali, derivatives and other commodity or other chemical business, as operated at, or at any time prior to, the Business Transfer Time, at or in respect of the Spinco Active sites which business currently produces chlorine, caustic soda and related chemicals for use in chemical manufacturing, pulp and paper production, water treatment, plastics production, agricultural products, pharmaceuticals and other applications; provided that, notwithstanding the foregoing, the "Eagle Business" shall include any discontinued chlor-alkali, derivatives and other commodity or other chemical products manufactured by Burgundy [PPG] or its Affiliates at any Spinco Active Site at any time prior to the Business Transfer Time.  For the avoidance of doubt, the Eagle Business includes the production of any products manufactured at a Spinco Active Site and also at a Spinco Inactive Site, including the production of perchlorethylene or trichloroethylene by Burgundy [PPG] and its Affiliates.

Record Document 133-2 at 10-11 (Ex. G at § 1.23).

Defendants argue that neither the brine pipelines at issue in this litigation nor the Brimstone Strip (the land containing the pipelines) fall within the definitions of "Spinco Active Sites" or "Spinco Inactive Sites."  See Record Document 237 at 24.  First, Defendants argue that the definition of "Spinco Inactive Sites" excludes real property assets to be acquired by

16

Spinco in the transfer. See id.[10]  Second, the Defendants argue that "Spinco Active Sites" by definition only include the "Real Property listed or described on Schedule 2.4(a)(ii), which does not include the pipelines or Brimstone Strip. See id. at 24-25. Defendants note that Schedule 2.4(a)(ii), lists only the Lake Charles, Louisiana Chlor-Alkali and Derivative Plant, located at 3100 Pete Manena Road, Westlake, Calcasieu Parish, Louisiana. See id. at 25; Record Document 133-4 (Ex. J-3). Defendants maintain that because neither the pipelines nor the Brimstone Strip may be included as either a Spinco Active Site or Spinco Inactive Site, they do not fall within the definition of "Eagle Business" and therefore, constitute "Non-Spinco Business," which would be excluded from liability. See Record Document 237 at 25-26.

Finally, Defendants contend that the pipelines simply are "Spinco Assets" based on Section 2.4(a)(xv), which includes "PPG's fee and/or leasehold interest … in and to the Starks and Sulphur Mines Salt Dome Facilities in Calcasieu Parish, Louisiana which service the Eagle Business at the Lake Charles site (including any and all personal property, pipelines, and other equipment…). Id. at 27. Based on the phrase "which service the Eagle Business" contained therein, Defendants argue that the pipelines cannot both "service" the Eagle Business and simultaneously be considered Eagle Business. See id. As such, the Defendants conclude that the pipelines are Non-Spinco Business, which is an excluded liability. See id.

Upon careful review of the Separation Agreement, paying special attention to the clauses referenced by the parties, the Court agrees with the Plaintiff and finds that the clauses therein provide for the express assumption of liabilities related to the pipeline operations.  First, the

---

[10] "Spinco Inactive Sites" is defined as "any and all Real Property owned, leased or operated prior to the Business Transfer Time by Burgundy [PPG] or its Affiliates (including the Spinco Group) related to Eagle Business, other than (i) the Spinco Active Sites and (ii) other Real Property expressly identified in this Agreement … as Assets to be acquired by any member of the Spinco Group." See Record Document 133-2 at 16 (Ex. G. at § 1.72).

Court finds that the pipelines involved in this litigation are clearly Spinco Assets used to service Eagle Business. The Court agrees that Section 2.4(a)(xiv) and associated Schedule 2.4(a)(xiv) provide that the pipelines and related equipment would be considered Spinco Assets. Further, Section 2.4(a)(xv) clearly defines Spinco Assets to include "[PPG's] fee and/or leasehold interests … in and to the Starks and Sulphur Mines Salt Dome Facilities in Calcasieu Parish, Louisiana which service the Eagle Business at the Lake Charles site (including … pipelines and other equipment owned by [PPG] in connection therewith." See Record Document 133-2 at 24 (Ex. G. at § 2.4(a)(xv)). This would undoubtedly include the pipelines in this litigation that run from the Sulphur Mines to the Lake Charles site.

Next, the Court finds that the Separation Agreement clearly provides that certain liabilities were expressly assumed from PPG, subject to exclusions, including: (1) "all Liabilities to the extent relating primarily to the Spinco Assets or the Eagle Business;" (2) "all Liabilities under Spinco Contracts; (3) "all Liabilities relating primarily to the Eagle Business or any Spinco Assets to the extent that the same constitutes a past, current or future tort …;" (4) all Liabilities relating to any Action related primarily to Eagle Business;" and (5) "all Liabilities, known or unknown for Environmental Conditions relating primarily to activities or operations at any of the Spinco Active Sites…." Id. at 25-27 (Ex. G. at § 2.5(a)(i), (iv), (ix), (xi), (xiv)(A)). The language of all five of these sub-sections is broad enough to encompass the pipelines, which are, at a minimum, Spinco Assets related to Eagle Business connected to activities and operations at a Spinco Active Site – the Lake Charles site.

While certain categories of liabilities were labeled as "Excluded Liabilities" in the Separation Agreement, such that they were not assumed, the Court finds that liabilities for environmental contamination resulting from the leaking pipelines in this lawsuit were not

18

included under the exclusion provisions of the agreement. As noted above, Section 2.5(b)(iii) excludes Environmental Liabilities arising from Non-Spinco Business. See id. at 28 (Ex. G. at § 2.5(b)(iii)). As such, the environmental liabilities from the leaking pipelines would only be excluded if they result from Non-Spinco Business, which is defined as "all businesses and operations … that are not included in Eagle Business." Id. at 14 (Ex. G at § 1.48). The Court finds that the pipelines at issue in this litigation constitute Eagle Business, which includes "the chlor-alkali, derivative and other commodity or other chemical business, as operated at, or any time prior to the Business Transfer Time, at or in respect of the Spinco Active Sites …." Id. at 10-11 (Ex. G. at § 1.23) (emphasis added). There is no question that the Lake Charles site is a Spinco Active Site. Similarly, it seems clear to this Court that the pipelines moving the brine into the Lake Charles site for processing are, at a minimum, operating "in respect of" the Lake Charles site. As such, the Court finds that the pipelines are included in Eagle Business under the terms of the Separation Agreement, and therefore, the Environmental Liabilities arising therefrom would not constitute Non-Spinco Business subject to exclusion by Section 2.5(b)(3). In short, the Court finds that the liabilities associated with the pipelines were expressly assumed in the Separation Agreement.

      The Court's decision herein is consistent with the opinion of the 14th Judicial District Court, Parish of Calcasieu, Louisiana, which found in a related lawsuit that the Defendants assumed liability associated with the pipelines for leaks occurring prior to the January 28, 2013, transfer of ownership from PPG. See Record Document 152-4. While the opinion of the 14th Judicial District Court is not subject to res judicata given that the litigation involved a different property owner, the Court nonetheless finds the opinion persuasive.[11]

---

[11] A judgment is conclusive only between the same parties. See La. R.S. § 13:4231.

19

## CONCLUSION

Based on the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment on Assumption of Liabilities and Obligations (Record Document 132) is **GRANTED**, and Defendants' Motion for Partial Summary Judgment Seeking Dismissal of Plaintiff's Successor Liability Claims (Record Document 237) is **DENIED**. An order consistent with this finding will issue forthwith.

**THUS DONE AND SIGNED**, this 4th day of May, 2022.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE